[No. E010011. Fourth Dist., Div. Two. Apr. 14, 1995.]

EDWARD L. TAGGART et al., Plaintiffs and Appellants, v.
SUPER SEER CORPORATION, Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

*\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for
publication with the exception of parts III, IV, V, VI, VII, VIII, IX, and X.

**COUNSEL**

Timothy L. Taggart and Edward L. Taggart for Plaintiffs and Appellants.

Chase, Rotchford, Drukker & Bogust and Craig N. Beardsley for Defendant and Respondent.

**OPINION**

**RAMIREZ, P. J.**—Plaintiff Edward L. Taggart (Taggart), a police officer, was thrown from his motorcycle during training. Afterwards, he developed symptoms which were eventually diagnosed as epilepsy. Taggart and his wife Sarah (collectively plaintiffs) then filed this action against Super Seer Corporation (Super Seer),[1] the manufacturer of the helmet Taggart had been wearing when he fell from the motorcycle, alleging causes of action for products liability, negligence, and loss of consortium. The jury found for Super Seer. Plaintiffs filed a motion for judgment notwithstanding the verdict or new trial, which was denied. Plaintiffs filed a timely notice of appeal.

On appeal, plaintiffs contend:

1. Reports on tests conducted by Southwest Research Institute (Southwest) which showed that the helmet failed to comply with the federal motor vehicle safety standard applicable to motorcycle helmets were erroneously excluded.

---

[1] Initially, plaintiffs named a number of defendants. When the case went to trial, however, the only defendant was Super Seer. Although the record does not indicate what became of the other defendants, Super Seer has advised us that plaintiffs settled with them before trial.

2. The trial court erroneously ruled that Mr. Thom, plaintiffs' helmet expert, was not qualified to testify that other helmets were available which would have prevented Taggart's injuries.

3. The testimony of Dr. Newman, Super Seer's helmet expert, should have been excluded because Super Seer failed to disclose in discovery the fact that Dr. Newman had conducted tests of the helmet.

4. Dr. Newman's testimony that he conducted tests of the helmet should have been excluded because it lacked a trustworthy basis.

5. Dr. Newman's testimony that Southwest's test results were unreliable should have been excluded because it was based on impermissible experimental scientific evidence.

6. Evidence that plaintiffs had commenced certain other litigation should have been excluded as more prejudicial than probative.

7. Letters from the United States Department of Transportation (DOT) should have been excluded as hearsay, irrelevant, and more prejudicial than probative.

8. The jury should have been instructed to find that the helmet was defective if plaintiffs proved that the helmet's design caused Taggart's injuries, and if Super Seer failed to prove that the benefits of the design outweighed the resulting risk of danger.

9. The jury should have been instructed on the federal motor vehicle safety standard applicable to motorcycle helmets, and on how to apply the doctrine of negligence per se if the helmet violated this standard.[2]

We find no prejudicial error, and we will affirm.

## I.

### FACTUAL BACKGROUND

In 1976 or 1977, Taggart joined the San Bernardino police force. In 1985, he transferred from patrol to the motorcycle division. On Wednesday, June

---

[2]In their reply brief, plaintiffs also argue that the trial court erroneously permitted counsel for Super Seer to ask whether Taggart was paying his medical expenses out of his own pocket. Because plaintiffs failed to raise this argument in their opening brief, however, Super Seer has been deprived of an opportunity to respond to it. We therefore need not—and we do not—consider it. (*Varjabedian* v. *City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11 [142 Cal.Rptr. 429, 572 P.2d 43]; *Stoll* v. *Shuff* (1994) 22 Cal.App.4th 22, 25, fn. 1 [27 Cal.Rptr.2d 249]; see generally, 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 496, pp. 484-485.)

12, 1985, as part of his motorcycle training, Taggart was practicing a "decel" (rapid deceleration) maneuver. On one attempt, he braked too hard and was thrown, rolling or tumbling, off the motorcycle. He struck the ground with his right hip, then rolled or slid along the pavement, shredding his shirt and scraping skin from his back, shoulders, and arms. He ended up in a sitting position. Taggart did not remember hitting his head; the back of his helmet, however, was scraped.

Taggart was taken to a doctor's office, examined, and treated. He did not think he was seriously injured. He went back to work the following Monday and completed his motorcycle training. In the days and weeks following, however, he experienced headaches, confusion, forgetfulness, and irritability. Muscles in his right leg twitched.

On July 2, 1985, Taggart consulted an orthopedist because he thought a bone in one hand might be broken. When he told the orthopedist about his other symptoms, however, the orthopedist referred him to a neurologist. The neurologist placed him on a medical leave of absence.

On August 30, 1985, Taggart got into an argument with two of his supervisors, Lieutenant Thomas and Sergeant Selles. Taggart tried to leave, but Thomas shoved him backward; Taggart fell into a chair and banged his head on the wall behind him. Taggart had begun feeling better, but the shoving incident made him feel like he "had had the accident very recently again." His headaches became more frequent and more severe.

Some months after the accident, Taggart's twitching turned into involuntary muscular contractions involving his whole body. On October 17, 1985, the neurologist told Taggart he could never resume work as a policeman. Around December 1985 or January 1986, Taggart learned from other doctors that he had brain damage. They agreed that he could not resume police work. In May 1986, he was involuntarily retired on medical grounds.

On June 24, 1986, Taggart was given an electroencephalogram. As a result, he was diagnosed as having epilepsy. His involuntary muscular contractions were deemed seizures. He had to take both anticonvulsive medication and pain medication. Medication, however, did not completely prevent him from having seizures. There was evidence that his epilepsy was caused by the motorcycle accident.

Even Super Seer's neurological expert, Dr. Peacher, concluded that Taggart had epilepsy or "post-traumatic seizure disorder" as a result of the motorcycle accident, although he felt some of Taggart's symptoms were

more likely due to stress or other psychological factors. Super Seer's psychiatric expert, Dr. Naftulin, however, found no signs that Taggart had any head injury, but did find indications that he was, consciously or unconsciously, faking his symptoms.

The motorcycle helmet Taggart was wearing when his accident occurred had been manufactured by defendant Super Seer in 1981. It consisted of a fiberglass outer shell and a polyurethane energy-absorbing liner.

Federal Motor Vehicle Safety Standard (FMVSS) 218, promulgated by the DOT, prescribes performance standards for motorcycle helmets. (See generally, 49 C.F.R. § 571.218 (1993).) Helmet manufacturers must comply with FMVSS 218. Under FMVSS 218, helmet performance is measured by, among other things, an "impact attenuation test": a helmet, mounted on a "headform" containing instrumentation, is repeatedly dropped onto a hard surface under controlled conditions. A helmet fails the impact attenuation test if the instrumentation registers any of the following: (1) more than 400 g's of acceleration; (2) acceleration of more than 200 g's for more than 2 milliseconds; and (3) acceleration of more than 150 g's for more than 4 milliseconds. A helmet's performance in an impact attenuation test is related to how well it protects against head injury.

In 1981 and 1984, Southwest performed impact attenuation tests on Super Seer helmet model 1602. Taggart's helmet was model 1608. Model 1602 and model 1608 differed only as to harness shape and visor; they had the same outer shell and polyurethane liner. The helmet failed every time. Sixteen drops onto a flat surface were required in every test; it failed on at least three out of sixteen and as many as eight out of sixteen drops.

Plaintiffs' helmet expert, David Thom, testified that the helmet was defective in at least four respects. First, the inner liner was made from polyurethane rather than polystyrene (i.e., styrofoam). According to Mr. Thom, polyurethane does not absorb an impact as well as polystyrene. The vast majority of helmets manufactured since the mid-1970's have used polystyrene. Second, the liner was only three-quarters of an inch thick. Helmets manufactured in 1981 typically had liners at least one inch thick. Mr. Thom testified that a helmet needed a liner at least one inch thick in order to be certain to pass an impact attenuation test. Third, the liner was too dense, which made it hard—"like a rock." Fourth, the outer shell was excessively thick, heavy and strong. Mr. Thom concluded that the helmet did not provide as much protection as a helmet which complied with FMVSS 218.

Mr. Thom noted that Taggart's helmet had sustained merely cosmetic damage. He testified that a helmet which has received an impact in an

accident should be "squashed": the shell should be delaminated or even fractured, and the liner should be crushed. He also opined that "[t]he typical result from an accident like this is no head injury whatsoever, and there was a head injury . . . as a result of this accident[.] . . . [T]he obvious conclusion is that [the] helmet did not do what it was supposed to do . . . ."

Super Seer's helmet expert, Dr. James Newman, testified that the helmet was "compatible with the state of the art." It had sound basic design principles, a good, solid, strong shell, and an energy-absorbing liner. He agreed that 90 percent of helmets used a polystyrene liner, but explained "[t]he main reason for that is it's cheap."

Dr. Newman had found Southwest's test data to be unreliable. Dr. Newman himself had performed impact attenuation tests on Super Seer helmets "virtually identical" to Taggart's about two or three years before he testified. The helmets passed the tests; there were no failures. Dr. Newman concluded, based on his tests and based on the fact that the helmet was "typical," that it complied with FMVSS 218.

Finally, Dr. Newman testified, based on summaries of Taggart's medical records, that Taggart did not have the type of injuries that would indicate a helmet failure. He concluded, "either [Taggart] didn't hit his head or the helmet worked."

Robert Smith, the president of Super Seer, testified that Taggart's helmet was consistent with the state of the art in 1981. He also testified that no other type of helmet available in 1981 provided better protection. He considered polystyrene no more energy-absorbing than polyurethane. Super Seer had continued to use polyurethane liners.

Smith also testified that in 1981, the DOT had sent Southwest's test reports to Super Seer. The DOT indicated that it was considering recalling Super Seer's helmets, and asked Super Seer to respond. Later in 1981, Super Seer sent the DOT additional information, including results of tests performed by an independent testing laboratory, Hauser Research Laboratories, which indicated that its helmets complied with FMVSS 218. In response, the DOT told Super Seer it was closing its files with respect to Super Seer helmet models 1602, 1604, and 1608.

## II.

### ADMISSIBILITY OF THE SOUTHWEST TEST REPORTS

Counsel for plaintiffs stated that Southwest had refused to respond to a subpoena calling for its test reports. He had asked the DOT to produce

records pertinent to the helmet; in response, the DOT had sent copies of the Southwest test reports. Once the DOT produced the copies, Southwest agreed to have its custodian of records look at the DOT's copies, confirm that they were true copies of its reports, and supply a declaration to that effect. Southwest duly returned such a declaration, together with the copies, in a sealed envelope, pursuant to sections 1560 and 1561 of the Evidence Code.[3]

Super Seer then moved *in limine* to exclude any evidence that the helmet was defective due to failure to comply with FMVSS 218. It noted that plaintiffs' helmet expert had never tested the helmet himself; any opinion on his part that the helmet had failed to pass impact attenuation tests would be based entirely on the Southwest reports, which, it argued, were inadmissible hearsay. Plaintiffs filed a written opposition in which they argued that the Southwest reports were admissible under the business records exception to the hearsay rule (§ 1271).

In connection with the hearing on the motions *in limine*, the trial court opened the sealed envelope. It reviewed the Southwest reports and the custodian's declaration. Super Seer then objected that the custodian's declaration failed to demonstrate that the reports were admissible under the business records exception, because the custodian did not testify to the identity or mode of preparation of the documents. The trial court overruled this objection; it found that the "declaration meets the requirements of Evidence Code [s]ection 1271." It therefore held that one page of each report, showing the numerical test results, was admissible under the business records exception, and that plaintiffs' expert witness could "us[e] those numbers as a basis of his opinion." It held the remainder of the reports inadmissible because they contained opinions that were not admissible under the business records exception.

Plaintiffs' helmet expert, Mr. Thom, then testified that he had reviewed the pages of test results. He identified them as the results of tests conducted by Southwest in 1981 and 1984 to determine whether Super Seer helmets similar to Taggart's complied with FMVSS 218. He stated that the test results showed "a significant number of failures." Mr. Thom concluded that the Southwest test results supported his opinion that the helmet was "outdated" and would have difficulty complying with FMVSS 218.

At the close of trial, Super Seer objected to admission of the numerical test results. The trial court reversed its earlier ruling that they were admissible. It explained: "I have admitted reference to them in Thom's testimony,

---

[3]Further statutory citations will be to the Evidence Code, unless otherwise specified.

but in my own mind, I think it's not fair for them to have the records themselves back there. I think that gives the plaintiffs unfair advantage, that with respect to the defense experts, all they have got is oral testimony; with respect to the plaintiffs' expert, they're going to have the written testimony; and I think that makes it unfair. It should be oral on oral."

██  Plaintiffs contend that the Southwest reports were admissible in their entirety under the business records exception to the hearsay rule;[4] thus, the trial court erred at the beginning of trial, when it excluded all but a single page of each report, and at the end of trial, when it excluded even those pages. We disagree. The Southwest reports were inadmissible in their entirety, because they were hearsay and the custodian's declaration failed to lay a sufficient foundation for their admission under the business records exception.

In section 1560 et seq., the Legislature has provided a streamlined method for the production of the records of a business in response to a subpoena duces tecum. Unless the subpoena provides otherwise (§§ 1560, subds. (a), (e), 1564), the custodian or other qualified witness may send a copy of the records by mail in a sealed envelope (§ 1560, subd. (b)). If the subpoena is for attendance in court, the custodian mails the sealed envelope to the court. (§ 1560, subd. (c)(1).) If the subpoena is for attendance at a deposition, the custodian mails the sealed envelope to the deposition officer. (§ 1560, subd. (c)(2).)

Along with the records, the custodian must also send an affidavit which states that: (1) "[t]he affiant is the duly authorized custodian of the records or otherwise qualified witness and has authority to certify the records," (2) "[t]he copy is a true copy of all the records described in the subpoena . . . ,"[5] and (3) "[t]he records were prepared by the personnel of the business in the ordinary course of business at or near the time of the act, condition, or event." (§ 1561, subd. (a).) The affidavit is admissible as evidence of these matters. (§ 1562.) Moreover, "[i]f the original records would be admissible in evidence if the custodian had been present and testified to the matters stated in the affidavit, and if the requirements of Section 1271 have been met, the copy of the records is admissible in evidence." (*Ibid.*)

Section 1271 embodies the business records exception to the hearsay rule. It provides that:

---

[4]In their reply brief, plaintiffs also suggest that the Southwest reports were admissible under the official records exception to the hearsay rule (§ 1280). (At the same time, they cease referring to them as the "Southwest reports" and suddenly begin calling them the "DOT reports" instead.) As we have already noted, however (see fn. 2, *ante*), we need not address contentions first raised in a reply brief.

[5]Alternatively, the custodian may state that "the business has none of the records described, or only part thereof." (§ 1561, subd. (b).)

"Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if:

"(a) The writing was made in the regular course of a business;

"(b) The writing was made at or near the time of the act, condition, or event;

"(c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and

"(d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

■ It will readily be seen that a custodian's declaration may state all the matters it is required to state under section 1561, yet fail to provide a sufficient foundation for admission of the records under section 1271. (1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 2d ed. 1982) Business Records, § 4.1, pp. 212-213 [hereafter Jefferson]; 2 Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 1994) ¶ 8:1637, pp. 8D-133 to 8D-134.) Most significantly, the custodian's declaration is not required to state the "identity" or "mode of preparation" of the records. As a result, it will usually fail to show that "[t]he "sources of information and method and time of preparation" of the records indicate their trustworthiness. "Therefore, in the face of a hearsay objection, the affidavit of the custodian, made pursuant to [section] 1561, does not satisfy the requirements of the business-records exception to the hearsay rule set forth in [section] 1271(c)-(d), and the copy of the business record, produced pursuant to [sections] 1560-1561, is inadmissible hearsay." (Jefferson, *supra*, § 4.1, p. 213.)

■ Here, the custodian's declaration conformed meticulously to section 1561. However, it contained no evidence as to what the Southwest reports were, how they were prepared, or what sources of information they were based on. It offered no evidence that the Southwest reports were trustworthy.[6] The reports therefore failed to qualify for admission as business records under section 1271. (*People* v. *Hamilton* (1963) 60 Cal.2d 105, 131 [32 Cal.Rptr. 4, 383 P.2d 412] [decided under Uniform Business

---

[6]After the trial court ruled on the motions *in limine*, Mr. Thom, plaintiffs' expert witness, testified that the Southwest reports "most likely" were done under contract to the DOT. He also purported to testify to how the testing was conducted. He later admitted, however, that he had no personal knowledge of how Southwest's testing was conducted, or how the Southwest reports were prepared; his testimony was based on the contents of the reports themselves. He

Records as Evidence Act, former Code Civ. Proc., §§ 1953e-1953h, predecessor to § 1271], disapproved on other grounds in *People* v. *Daniels* (1991) 52 Cal.3d 815, 866 [277 Cal.Rptr. 122, 802 P.2d 906] and *People* v. *Morse* (1964) 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]; *People* v. *Matthews* (1991) 229 Cal.App.3d 930, 939-940 [280 Cal.Rptr. 134].)

Plaintiffs cite *In re Troy D.* (1989) 215 Cal.App.3d 889 [263 Cal.Rptr. 869], which held that a custodian's declaration in compliance with section 1561 provided sufficient foundation for admission of the underlying records. (215 Cal.App.3d at p. 903 & fn. 16.) *Troy D.* specifically rejected the view Justice Jefferson takes in his benchbook, upon which we rely. At the time, however, section 1562 stated merely that "[t]he copy of the records is admissible in evidence to the same extent as though the original thereof were offered and the custodian had been present and testified to the matters stated in the affidavit." (Former § 1562, Stats. 1965, ch. 299, § 1562, p. 1354; *In re Troy D.*, *supra*, 215 Cal.App.3d at p. 903.) The *Troy D.* court appears to have construed this as a hearsay exception separate and distinct from section 1271. Thus, it stated, "We decline to hold that Evidence Code section 1561 does not satisfy the business records exception. *The Legislature has the prerogative of fashioning exceptions to the hearsay rule. The exception it has provided here* does not appear to us to conflict with the requirements of the business records exception."[7] (215 Cal.App.3d at p. 903, fn. 16, italics added.)

In 1989, however, even as *Troy D.* was being written, the Legislature amended section 1562, effective January 1, 1990. The amendment added a provision that the copy of the records is admissible based on the custodian's declaration only "if the requirements of Section 1271 have been met." (§ 1562, Stats. 1989, ch. 1416, § 31.) This new language makes it clear that section 1562 is not a hearsay exception. The fact that section 1562 provides no assurances of competency, reliability, or trustworthiness further militates against regarding it as a hearsay exception. (*Daniels* v. *Department of Motor Vehicles* (1983) 33 Cal.3d 532, 538-539 [189 Cal.Rptr. 512, 658 P.2d 1313] [Veh. Code, § 14108 is not a hearsay exception].) Thus, a declaration in compliance with sections 1560 and 1561 is insufficient to guarantee that the records produced will be admissible. The proponent also must comply with the additional requirements of section 1271.

therefore was not competent to provide a business records foundation for the reports. (*People* v. *Shirley* (1978) 78 Cal.App.3d 424, 438 [144 Cal.Rptr. 282].)

[7]We believe *Troy D.* stopped short of holding that a custodian's declaration under section 1561 in fact satisfies all the foundational requirements of the business records exception under section 1271 (although it declined to hold to the contrary). If it could be read as so holding, however, we would disagree, for the reasons stated above.

We are aware that this construction of section 1560 et seq. lessens their usefulness as a low-cost way to obtain documentary evidence for use at trial. Nevertheless, our construction is compelled by the fact that the Legislature has expressly made admissibility under section 1562 conditional on satisfying the business records exception of section 1271. We conclude that the Legislature did so intentionally, to prevent the wholesale admission of hearsay lacking any guarantees of reliability or trustworthiness. A contrary construction would create a hole in the business records exception big enough to drive a truckload of hearsay through; the proponent of a business record who could not show how it was prepared, or who knew that the way it was prepared would indicate that it was untrustworthy, could nevertheless introduce the record into evidence.

The Legislature's wisdom is demonstrated by what occurred in this case: not only did plaintiffs fail to show that the records were trustworthy, but Super Seer had no opportunity to show that the records were *un*trustworthy, or *un*reliable. Normally, where the proponent of evidence invokes the business records exception, the opponent can test the applicability of the exception by cross-examining the custodian of the records. Here, however, Super Seer had no opportunity to depose and cross-examine either the custodian or the Southwest employees who actually prepared the reports.[8] More importantly, as Southwest was not within the jurisdictional range of the subpoena power (see Code Civ. Proc., § 1989), Super Seer had no opportunity to subpoena the custodian for trial. The custodian's declaration enjoyed an irrebuttable and conclusive effect on the admissibility of the records.

The trial court was on the right track when it recognized that, despite the custodian's declaration, the Southwest reports had to satisfy the requirements of the business records exception. Thus, it refused to admit those portions of the Southwest reports which it found constituted opinion rather than "a record of an act, condition, or event." (See *People* v. *Reyes* (1974) 12 Cal.3d 486, 503 [116 Cal.Rptr. 217, 526 P.2d 225].) It erred, however, when, over Super Seer's objection, it held that the custodian's declaration satisfied all the other prerequisites of the business records exception and ruled that numerical test results in the reports would be admissible. It corrected its own error by reversing itself at the close of trial and refusing to admit the numerical test results. Even assuming that its reason for doing so was erroneous, the result was not. We review only the trial court's ruling, not its reasoning. (*Belair* v. *Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 568 [253 Cal.Rptr. 693, 764 P.2d 1070]; *D'Amico* v. *Board of Medical*

---

[8]Because plaintiffs subpoenaed the records for trial rather than for a deposition, Super Seer was not entitled to notice of the subpoena. (See Code Civ. Proc., §§ 1985, 1987, 1987.5; cf. Code Civ. Proc., §§ 2020, subd. (d), 2025, subd. (c).)

*Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10]; *Bro* v. *Glaser* (1994) 22 Cal.App.4th 1398, 1405 [27 Cal.Rptr.2d 894].) Because plaintiffs failed to lay a foundation for the admission of the Southwest reports under the business records exception, the trial court properly excluded the reports in their entirety.

### III.-X.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### XI.

#### Disposition

The judgment is affirmed in its entirety. Super Seer shall recover costs on appeal against plaintiffs.

Hollenhorst, J., and McDaniel, J.,† concurred.

A petition for a rehearing was denied May 8, 1995, and appellants' petition for review by the Supreme Court was denied August 23, 1995.

---

*See footnote, *ante*, page 1697.

†Retired Associate Justice of the Court of Appeal, Fourth District, senior judge status (Gov. Code, § 75028.1), sitting under assignment by the Chairperson of the Judicial Council.