[No. B156333. Second Dist., Div. Four. Dec. 19, 2002.]

ANDREW SANCHEZ, Plaintiff and Appellant, v.
HILLERICH & BRADSBY CO. et al., Defendants and Respondents;
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant and
Appellant.

**COUNSEL**

Lowthorp, Richards, McMillan, Miller, Conway & Templeman, Alan R. Templeman, Dean W. Hazard; Lascher & Lascher and Wendy Cole Lascher for Plaintiff and Appellant.

La Follette, Johnson, De Haas, Fesler, Silberberg & Ames, Peter J. Zomber and David J. Ozeran for Defendant and Respondent Hillerich & Bradsby Co.

Wilson, Kenna & Borys and Lawrence Borys for Defendants and Respondents Pacific-10 Conference and University of Southern California.

Miller, Canfield, Paddock & Stone, Frederick R. Juckniess; Call & Jensen, Wayne W. Call and Mark L. Eisenhut for Defendant and Appellant.

**OPINION**

**HASTINGS, J.**—Appellant Andrew Sanchez, a pitcher, was seriously injured when struck by a line drive hit by an aluminum bat. He filed suit

against the bat manufacturer and others alleging that the design and use of this particular bat significantly increased the inherent risk in the sport of baseball that a pitcher would be hit by a line drive. Defendants moved for summary judgment asserting primary assumption of the risk and that appellant would be unable to prove causation. The trial court granted summary judgment when it concluded that appellant would be unable to prove that his injuries resulted from the alleged increased risk the particular bat posed to pitchers. We reverse. Appellant presented sufficient evidence to establish that use of this particular bat significantly increased the inherent risk that a pitcher would be hit by a line drive and that the unique design properties of this bat were the cause of his injuries.

FACTUAL AND PROCEDURAL BACKGROUND

On April 2, 1999, appellant, pitching for California State University, Northridge (CSUN), was struck by a line drive off the bat of a player for the University of Southern California (USC), Dominic Correa. Appellant suffered serious head injuries from the incident. Correa was using an aluminum bat, the Air Attack 2, designed and manufactured by respondent Hillerich & Bradsby Co. (H&B).

USC was a member of the Pac-10, a collegiate athletic conference. The Pac-10 was a member of the National Collegiate Athletic Association (NCAA), a nonprofit organization of collegiate athletic conferences and other institutions. The NCAA establishes rules for equipment used in athletic events, including baseball bats. CSUN was a member of the NCAA, but not a member of the Pac-10.

The bat used by Correa was a newly designed hollow aluminum alloy bat with a pressurized air bladder which, according to its designer, substantially increases the speed at which the ball leaves the surface of the bat. Correa was supplied with the bat pursuant to an agreement between USC and H&B, which provided that USC would receive compensation for using H&B's Louisville Slugger equipment exclusively. At the time of the accident, the NCAA rules allowed the use of metal bats, and the bat was made in compliance with NCAA standards. However, prior to the start of the 1999 season, the NCAA notified athletic conferences under its umbrella, including the Pac-10, of the dangerous nature of the newer metal bats and of its decision to implement new rules to decrease the speed of the batted balls effective August 1, 1999. The Pac-10 implemented some of the proposed standards prior to the 1999 baseball season.

Prior to the commencement of the 1999 baseball season, appellant had signed a disclaimer form acknowledging that his participation on the team

carried a risk of injury, specifically including brain damage, and consenting to assume the risk of such injury.

At the time of the injury, appellant and all of his team members were using metal bats, and appellant had used a metal bat in organized baseball games since he was six years old.

On March 17, 2000, appellant filed a lawsuit against H&B, USC, NCAA and Pac-10 asserting causes of action for products liability and negligence. Appellant later struck the product liability claim against USC and the Pac-10.

Each defendant moved separately for summary judgment. H&B's motion was based on the following grounds: (1) that appellant could not establish causation as a matter of law; (2) the action was barred by the doctrines of primary assumption of risk and express assumption of risk; and (3) that H&B was entitled to judgment because the bat was in compliance with rules established by the NCAA.

In support of its motion, H&B submitted portions of deposition testimony from various witnesses. Mike Batesole, one of appellant's coaches, testified that he saw the incident, he had seen other pitchers hit by batted balls before, and that the risk of a pitcher being hit by a batted ball is inherent in the sport of baseball. Dominic Correa, the batter, also testified that he saw the ball strike appellant in the temple and saw appellant fall to the ground. He had no opinion about the speed of the ball. Michael Gillespie, the head coach for USC, testified that the game was not videotaped. He also testified that in his opinion, metal bats do not perform differently from wood bats. He believed that the bat used by Correa met NCAA standards, but had no specific information to confirm whether it did nor not. Marty Archer, the president of H&B, testified that he had instructed his employees to make bats which conformed with the regulations of the various regulatory bodies involved and that H&B did so construct the bats. He also stated that H&B had never given money to the NCAA to influence it. Rhonda Hyatt, the head athletic trainer for CSUN, testified that when presenting the disclaimer form to baseball players, she normally would read to them the clause about assumption of risk word for word before they signed it. At deposition, appellant testified he was aware that pitchers were at risk for being hit by a line drive.

The motion by the NCAA also contended that the doctrine of primary assumption of risk barred appellant's claim against it and that appellant could not establish causation. In addition, it argued that it did not owe a duty to appellant because at the time of the accident the baseball community was

in significant disagreement over the risk of aluminum bats. The NCAA submitted numerous documents in support of its motion which the trial judge did not consider because they were not properly authenticated.

USC and the Pac-10 based their motion on primary assumption of risk, arguing that a pitcher being struck by a batted ball was a risk inherent in the sport of baseball.

In opposition to each of the motions, appellant argued that primary assumption of risk was not applicable because of an increased risk presented by the Air Attack 2 over that of other bats previously in use and that the increased risk was a substantial cause of appellant's injuries. In support, he submitted four declarations.

Jack Mackay, the designer of the Air Attack 2, declared that he had been a designer and tester of bats for nine years and was a paid consultant for H&B's Louisville Slugger division. Mackay was present when time studies were performed on the bat at a Louisville Slugger testing center. He stated that the invention allowed a batter to hit a ball at speeds in excess of that which would have given a pitcher time to avoid being hit. As a result, he opined that the Air Attack 2 *substantially* increased the risk of a pitcher being hit by what he termed a "come backer." Mackay complained to his employers at the Louisville Slugger division of H&B about the increased risks of injuries, but the complaints were ignored and Marty Archer, president of the division, warned Mackay that he should not publicly discuss issues of safety.

William Thurston, a college baseball coach and editor of the NCAA Baseball Rules Committee from February 1985 to July 2000, had initiated an NCAA study tracking pitcher injuries from high-performance aluminum bats. He concluded that the Air Attack 2 *substantially* increased the risk of a pitcher being hit by a line drive over the risk associated with wood bats or earlier generations of nonwood bats. He also compiled an analysis of statistics of college hitters and batters for the years 1997-2001, comparing their performance when using wooden bats versus aluminum bats and concluded there was a tremendous increase in hits and runs when aluminum bats were used.

The deposition transcript of Rhonda Hyatt was also submitted. She testified that Justin Kiersby, the student athletic trainer for appellant's team, was in the dugout when the ball was hit and wrote down his observation that the ball was sent back at appellant at over 100 miles per hour.

Appellant also submitted the declaration of James G. Kent, who had a Ph.D. in kinesiology. Based on his training and review of the evidence, he

opined that the ball which struck appellant's head was traveling between 101 and 107.8 miles an hour, probably closer to the latter speed than the former. This would have left appellant a reaction time of .32 to .37 seconds to avoid the ball. This was below the minimum reaction time accepted by the NCAA and other organizations of .39 seconds. As a result, he concluded that appellant's head injury resulted from the increased danger posed by this particular bat.

The superior court granted the motions of H&B, USC and Pac-10 on the ground that appellant would not be able to prove causation. But it concluded that it could not grant summary judgment to NCAA because of NCAA's failure to submit admissible evidence. Instead, it treated the NCAA's motion as one for judgment on the pleadings and concluded that appellant would not be able to truthfully plead causation against the NCAA. As pertinent, its order states:

"Nowhere in the 21 paragraphs of the complaint does [appellant] allege that the defective bat caused the injuries suffered by [appellant]. All he alleges is that the allegedly defective product and defendants' negligence increased the risk that [appellant] would be injured. Increased risk is not actionable. [Appellant] has to plead, and then prove, a sufficient causal connection between defendants' negligence and the injury. [¶] . . . [¶]

"[Appellant's] submissions in opposition to the summary judgment motion were insufficient to show that H&B's alleged negligence was an actual, legal cause of plaintiff's injuries. [Appellant] does not dispute that there was no videotape of the incident. The deposition transcripts of Kiersby indicates that the ball was so fast he does not know if anyone observed it, including him, and there was no foundation for the conclusion set forth in the notes attached to Ms. Hyatt's deposition. Lastly, the expert testimony set forth in the Declaration of James Kent, Ph.D., who has rendered an opinion about the exit velocity, is without foundation. Dr. Kent saw no videotape of the incident, nor did he examine [appellant]. All he did was review the videotape of [appellant] pitching prior to the date of the injury and some deposition transcripts. Like in the *Saelzler* case, [appellant's] expert is deprived of a key piece of evidence and his opinion is too tenuous to create a triable issue as to whether the exit velocity caused [appellant's] injuries. . . .

"[USC] and the Pac-10 also argue that [appellant] cannot prove causation and set forth . . . that [appellant] does not have all the information necessary to determine the speed of the baseball, adding that a range of potential speeds will be calculated by experts. The causation evidence offered by [appellant] in response is the same as that offered in response to H&B's causation argument . . . and is equally insufficient.

"[NCAA] did not submit any admissible evidence; [appellant's] foundation and hearsay objections were well-taken. . . . Again, [appellant's] evidence is insufficient to establish causation. Since the NCAA did not submit admissible evidence, the court cannot grant summary judgment. However, [appellant] has shown no ability to truthfully and accurately amend its complaint to show causation of the alleged injuries. Thus, the court will treat the NCAA's motion as a motion for judgment on the pleadings and, since . . . the court has determined that [appellant] cannot state a cause of action, no leave to amend is granted."

Further facts will be presented in connection with our discussion.

## DISCUSSION

■ In determining whether summary judgment was properly granted, we review de novo all of the admissible evidence set forth in the moving and opposing papers to determine whether there are any triable issues of material fact. If not, and the moving party is entitled to judgment as a matter of law, summary judgment is properly granted. The defendant moving for summary judgment must present facts to negate an essential element of the plaintiff's case or to establish a defense. If it does so, the burden shifts to the plaintiff to demonstrate a triable issue of material fact. (*Lowe v. California League of Prof. Baseball* (1997) 56 Cal.App.4th 112, 122 [65 Cal.Rptr.2d 105]; *Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 252 [38 Cal.Rptr.2d 65].)

We construe the moving parties' declarations strictly, and those of appellant's, liberally. (*Arnold v. Dow Chemical Co.* (2001) 91 Cal.App.4th 698, 707 [110 Cal.Rptr.2d 722].) Any doubts are to be resolved against granting the motion. (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].)

### 1. *Assumption of Risk*

■ In the companion cases of *Knight v. Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] and *Ford v. Gouin* (1992) 3 Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724, 34 A.L.R.5th 769], our Supreme Court addressed the distinction between the principles of assumption of the risk and comparative fault and adopted the phrases "primary assumption of risk" for the former and "secondary assumption of risk" for the latter. It did so in connection with its discussion of *Li v. Yellow Cab* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393]:

"[T]he distinction to which the *Li* court referred was between (1) those instances in which the assumption of risk doctrine embodies a legal conclusion that there is 'no duty' on the part of the defendant to protect the plaintiff

from a particular risk—the category of assumption of risk that the legal commentators generally refer to as 'primary assumption of risk'—and (2) those instances in which the defendant does owe a duty of care to the plaintiff but the plaintiff knowingly encounters a risk of injury caused by the defendant's breach of that duty—what most commentators have termed 'secondary assumption of risk.' . . .

". . . First, in 'primary assumption of risk' cases—where the defendant owes no duty to protect the plaintiff from a particular risk of harm—a plaintiff who has suffered such harm is not entitled to recover from the defendant, whether the plaintiff's conduct in undertaking the activity was reasonable *or unreasonable*. Second, in 'secondary assumption of risk' cases—involving instances in which the defendant has breached the duty of care owed to the plaintiff—the defendant is not entitled to be entirely relieved of liability for an injury proximately caused by such breach, simply because the plaintiff's conduct in encountering the risk of such an injury was *reasonable* rather than unreasonable. Third and finally, the question whether the defendant owed a legal duty to protect plaintiff from a particular risk of harm does not turn on the reasonableness or unreasonableness of the plaintiff's conduct, but rather on the nature of the activity or sport in which the defendant is engaged and the relationship of the defendant and the plaintiff to that activity or sport." (*Knight v. Jewett, supra*, 3 Cal.4th at pp. 308-309, italics in original and fns. omitted.)

■ When addressing the applicability of primary assumption of the risk, we analyze the nature of the activity and the role of each of the parties to that activity and decide as a matter of public policy whether the defendant should owe the plaintiff a duty of care. (*Shannon v. Rhodes* (2001) 92 Cal.App.4th 792, 795 [112 Cal.Rptr.2d 217].) A defendant owes no duty of care to protect a plaintiff against risks inherent in a particular sport voluntarily played by the plaintiff. But the defendant owes a duty to participants not to increase the risk of harm over and above that inherent in the sport. (*American Golf Corp. v. Superior Court* (2000) 79 Cal.App.4th 30, 36-37 [93 Cal.Rptr.2d 683]; *Bush v. Parents Without Partners* (1993) 17 Cal.App.4th 322, 329 [21 Cal.Rptr.2d 178]; *Branco v. Kearny Moto Park, Inc.* (1995) 37 Cal.App.4th 184, 190 [43 Cal.Rptr.2d 392].) The standards in the industry define the nature of the sport. (*American Golf Corp., supra*, at p. 37; *Bush, supra*, at p. 328; *Branco, supra*, at p. 190; *Ferrari v. Grand Canyon Dories, supra*, 32 Cal.App.4th at p. 257.) If it is determined that the actions of a defendant did increase the risk of harm above that inherent in the sport, primary assumption of the risk is not available and the issue becomes one of secondary assumption of the risk. (*Branco v. Kearny Moto Park, Inc., supra*, 37 Cal.App.4th at p. 193.)

A risk is inherent in a sport if its elimination (1) would chill vigorous participation in the sport; and (2) would alter the fundamental nature of the activity. (*Ferrari v. Grand Canyon Dories, supra*, 32 Cal.App.4th at p. 253.)

The essence of a baseball game is the contest between the defense, the pitcher and other players in the field, and the batter, for mastery over what happens to the pitched ball. The batter wants to hit the ball safely, usually away from the defense, so that the batter can advance on the bases. The defense wants to get the batter out, either by striking the batter out, or by causing the batter to hit the ball to a spot where one of the defensive players can make a play on it. Inherent in this mix is the risk that the pitcher, or any infielder, may have to catch, or avoid being hit with, a sharply batted ball. Appellant acknowledged he was aware of this risk. Thus, given the foundational facts of this case, a prima facie showing of assumption of the risk has been established. But appellant argued that use of the Air Attack 2 increased the risk above that inherent in the sport, and presented evidence on the issue. We now review that evidence.

At the time of the accident, the NCAA allowed the use of metal bats, and the bat in use was *apparently* in compliance with NCAA standards. It is undisputed that the Air Attack 2 was designed to cause the ball to come off the bat at a higher launch speed than with wooden bats and older metal bats. It is also undisputed that the inventor of the Air Attack 2 believed the Air Attack 2 *substantially* increased the risk of a pitcher being hit by what he termed a "come backer" and that he complained to his employers at H&B about these increased risks.

Additionally, the evidence submitted by appellant establishes that the Pac-10 and NCAA each believed that new generations of aluminum bats created a significant issue of safety. Before the incident at issue, the NCAA adopted new rules to regulate the exit speed of such bats, but postponed implementation of the rules until a date after this incident. On October 8, 1998, Thomas Hansen, commissioner of the Pac-10, sent a letter of protest to the NCAA about delayed implementation of the rules:

"I am writing on behalf of the Pacific-10 Conference Directors of Athletics to request that the NCAA reconsider its decision to postpone until August 1, 1999, a change in nonwood baseball bat specifications.

"We believe in light of the contents of your letter of August 28, 1998, that a change prior to the 1999 season is imperative. The comments of the NCAA Baseball Rules Committee and the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports warn of the dangers of using the

current bats. Since we consider the safety of competing student-athletes paramount, we believe an immediate change is in order since games are being played at this time.

"The Association's decision has left each conference and institution in an untenable legal position prior to August 1, 1999. Accordingly, we request reconsideration of this matter at the earliest possible time."

The NCAA not only believed that the newer aluminum bats created an increased risk of harm to players, it also believed that use of these bats changed the nature of the sport of college baseball. We quote from portions of a letter dated December 4, 1998, and sent by the NCAA Baseball Rules Committee to "Chief Executive Officers" "Directors of Athletics" "Head Baseball Coaches" and "Conference Commissioners":

"The NCAA adopted the new bat rule after a lengthy, careful and fair deliberative process. The baseball rules committee, composed of knowledge-able baseball coaches and administrators with many years of experience, has been concerned about runaway bat performance for many years. In 1988, 1993, 1994, 1995, 1996, 1997 and 1998, the committee studied the issue and took steps that it believed would reasonably curtail ever-increasing alumi-num bat performance. The committee's efforts in this regard were not successful, with the result that the performance level of aluminum bats continued to escalate. The committee has continuously monitored available statistics, participated in various studies supported by the manufacturers, and, until recently, trusted the information provided by the bat manufactur-ers. In some cases, the information has been less than trustworthy.

"Alarmed by the continuing increase in performance, the anecdotal and statistical evidence that the game of college baseball has been significantly altered by aluminum bat performance, and concerned about the increased safety risk, the committee determined to study the matter in depth in the summer of 1998. The committee convened a meeting in Kansas City, Missouri, in July 1998. All interested manufacturers, experts, and other knowledgeable persons were invited to make presentations to the committee in open session. The proceedings were stenographically recorded and the results are available should you wish to examine them. *The committee was unanimously convinced that bat performance was indeed a safety risk to pitchers and infielders, that there has indeed been a change in the way the college game of baseball is played, and that the available evidence was more than sufficient to justify a change in the rule as soon as practically possible There is simply no question that aluminum bats substantially outperform traditional wood bats, that the risk of injury to pitchers and infielders is real,*

*and that a performance limit on the aluminum bats was required to bring the game of baseball closer to its traditional form.*" (Italics added.)

This case is similar to *Branco v. Kearny Moto Park, Inc., supra,* 37 Cal.App.4th 184. There, participants on bicycles raced around a motocross (BMX) course which contained "jumps" as part of the course. The plaintiff was injured when he crashed and struck the side wall of the landing area of what is described as "an expert caliber jump." (*Branco v. Kearny Moto Park, Inc., supra,* 37 Cal.App.4th at p. 187.) He filed suit and the defendants asserted primary assumption of the risk. The trial court granted summary judgment for defendants but the Court of Appeal reversed. "It is not unreasonable to expect a BMX course to refrain from utilizing jumps which by design create an extreme risk of injury. Certainly the jumps, and falls, are inherent to the sport, and under the doctrine of primary assumption of risk, there is no duty to eliminate the jumps entirely, and no duty to protect from injury arising from reasonably designed jumps. However, the sport does not inherently require jumps which are designed in such a way as to create an extreme risk of injury. Accordingly, premised on the duty not to utilize dangerously designed jumps, this case falls under the secondary assumption of risk category, and issues pertaining to [the plaintiff's] comparative fault are for the trier of fact to decide. [The plaintiff's] expert's opinions regarding the design of the jump create a triable issue of material fact whether the million dollar jump was designed in such a way as to create an extreme risk of injury." (*Branco v. Kearny Moto Park, Inc., supra,* 37 Cal.App.4th at p. 193, fns. omitted.)

Here, appellant's evidence raises a triable issue of material fact whether the design and use of the Air Attack 2 substantially increased the inherent risk appellant faced. The evidence also raises at least a triable issue whether defendants knew of and appreciated the nature of the increased risk. The letters from the Pac-10 and the NCAA clearly establish they were aware of the additional danger presented by the newer aluminum bats. The NCAA letter was addressed to all "Head Coaches" and from that we can infer that the USC head coach was placed on notice of the increased risk, since USC was under the NCAA's umbrella. Mackay's declaration states that he warned H&B of the increased risk.

If it is ultimately determined primary assumption of the risk does not apply here, the issue then becomes one of secondary assumption of the risk. Comparing the relative fault of plaintiff and defendants is a question of fact that must be resolved by a trier of fact and cannot be resolved by way of a summary judgment motion. (*Donohue v. San Francisco Housing Authority* (1993) 16 Cal.App.4th 658, 666 [20 Cal.Rptr.2d 148]; *Davis v. Gaschler* (1992) 11 Cal.App.4th 1392, 1398 [14 Cal.Rptr.2d 679].)

## 2. *Causation*

Respondents contended, and the trial court agreed, that because the speed of the ball leaving the bat was never established, no causation attributed to the increased risk of use of the Air Attack 2, if any, could be established. Respondents cite to *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763 [107 Cal.Rptr.2d 617, 23 P.3d 1143] for the proposition that summary judgment cannot be granted when causation is not established. *Saelzler* does stand for that proposition. But application of *Saelzler* to the instant case is not as facile as argued by respondents. In *Saelzler*, a visitor to an apartment complex was attacked by three unidentified men at the complex, and she sought to impose liability on the owner for maintaining an unsafe premises. The Supreme Court concluded that without knowledge of who the attackers were it would be impossible to prove that any negligence on behalf of the owner of the complex was connected with the attack. Here, however, the connection is not so tenuous.

It is undisputed that Correa, using an Air Attack 2 manufactured by H&B, provided by USC, and approved by the NCAA, hit the ball that fractured appellant's skull. It is also undisputed that the Air Attack 2 was designed to and did increase the speed at which the baseball leaves the bat compared to other metal and wood bats. Thus, absent other factors (none are suggested) it follows that the ball must have reached appellant sooner than if Correa had used a bat other than the Air Attack 2. Dr. Kent opined that the ball that hit Correa was traveling at a speed of up to 107.8 miles per hour, giving appellant a reaction time of between .32 and .37 seconds, below the acceptable minimum time recognized by the NCAA.

The trial court concluded that Dr. Kent's declaration was without foundation because he "saw no videotape of the incident, nor did he examine [appellant]. All he did was review the videotape of [appellant] pitching prior to the date of the injury and some deposition transcripts." This does not accurately reflect what was set out in his declaration.

We first note that Dr. Kent attached his curriculum vitae to his declaration. It establishes that Dr. Kent has a Ph.D. in physical education, with a specialty in clinical kinesiology. He is a diplomat of the American Board of Forensic Medicine and of the American Board of Forensic Examiners. He describes his work experience from 1983 to present as follows: "Consulting services in Forensic and Occupational Kinesiology, *specializing in the analysis of biomechanics of trauma,* human performance analysis, clinical rehabilitation medicine and biomechanical accident reconstruction." (Italics added.) We now quote from the pertinent portions of his declaration:

"4. I have reviewed medical records regarding Mr. Sanchez's anatomic injuries as a result of this subject event. I have reviewed archival videotape footage of Mr. Sanchez pitching prior to the date of injury. I have reviewed the deposition transcripts of Mr. Sanchez, Justin Kiersby and Michael Gillespie. *I have also reviewed and relied upon literature regarding skull fracture and traumatic brain injury biomechanics,* National Collegiate Athletic Association (NCAA) Baseball rules and safety standards, and the Consumer Products Safety Commission (CPSC) and research[] conducted under the auspices of Hillerich & Bradsby (H&B). *Based upon my review of all of these materials, my training and experience, I have also completed quantitative analysis regarding the velocity necessary to cause Mr. Sanchez's injury pattern. I then compared the resulting ball flight time to the safety criteria established by the NCAA, CPSC and H&B sponsored literature. Based upon this analytic process, I have formed the opinions to follow.*

"5. *Analysis of skull fracture threshold biomechanics in conjunction with quantitative analysis utilizing basic principles of dynamics related to the flight of a baseball* demonstrate that the ball which struck Mr. Sanchez's head was traveling at a velocity not less [than] 101 (101.3) miles per hour and most probably was traveling at a velocity approximating 108 (107.8) miles per hour.

"6. Based on the conclusions stated above regarding ball velocity at impact, and using a range of distance from bat-ball strike to ball-head impact of 52 to 55 feet, the time period from bat-ball impact to ball-head impact ranges from not more than 0.37 seconds [to] not less than 0.329 seconds. The most *probable* time period was 0.335 to 0.342 seconds based upon a *most probable* distance of 53 to 54 feet with an impact velocity of 108 miles per hour.

"7. Based on the breadth of the literature reviewed to date as cited above, it appears that the NCAA as well as other individuals and organizations, including H&B, have concluded that 0.39 to 0.40 second is the time period over which a college pitcher can reasonably be expected to deflect a baseball as it travels from a bat strike towards their post-delivery fielding position. As a result, Mr. Sanchez was confronted with a significant reduction in the time available to him to deflect the ball which ultimately struck him versus the recommended and apparently accepted time range of 0.39 to 0.40 seconds.

"8. Based upon my analysis of this matter, *it is more probable than not* that Mr. Sanchez's head injury resulted from the use of a baseball bat which possessed mechanical properties allowing a batted ball to attain a flight

velocity in excess of a velocity that would allow for a reasonable reaction time by a pitcher in a post-delivery posture in a game situation." (Italics added.)

Respondents did not object to Dr. Kent's qualifications. Instead, citing to *People v. Leahy* (1994) 8 Cal.4th 587 [34 Cal.Rptr.2d 663, 882 P.2d 321] and *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240], and other cases, they argued that his declaration was deficient because it failed to explain the nature and type of calculations used to determine the speed of the ball and whether the type of calculations he performed were accepted by the scientific community at large. We cannot agree.

■ Cases dismissing expert declarations in connection with summary judgment motions do so on the basis that the declarations established that the opinions were either speculative, lacked foundation, or were stated without sufficient certainty. (See *Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1487 [72 Cal.Rptr.2d 232]; *Thai v. Stang* (1989) 214 Cal.App.3d 1264, 1276 [263 Cal.Rptr. 202].) That is not the situation here. It is sufficient, if an expert declaration establishes the matters relied upon in expressing the opinion, that the opinion rests on matters of a type reasonably relied upon, and the bases for the opinion. (*Kelley v. Trunk* (1998) 66 Cal.App.4th 519, 524 [78 Cal.Rptr.2d 122].)

■ As previously noted, respondents did not challenge Dr. Kent's credentials. He is a kinesiologist who, since 1983, has specialized "in the analysis of biomechanics of trauma." His declaration establishes that in forming his opinions he reviewed appellant's medical records, relied upon "literature regarding skull fracture and traumatic brain injury biomechanics," undertook a quantitative analysis regarding "velocity necessary to cause Mr. Sanchez's injury pattern" and "utilizing basic principles of dynamics related to the flight of a baseball" reached an opinion about the range of speed of the ball which hit appellant. While he does not spell out the actual calculations he used, the declaration is not deficient for purposes of summary judgment. If respondents had desired to do so, they could have deposed Dr. Kent in an attempt to demonstrate his opinions had no basis in fact or science. (*St. Mary Medical Center v. Superior Court* (1996) 50 Cal.App.4th 1531, 1538-1539 [58 Cal.Rptr.2d 182].)

Dr. Kent also relied upon literature from the NCAA regarding reaction times. The letter from the NCAA dated December 4, 1998, quoted above, also has a passage regarding reaction times: "Most of the experts providing information to the Baseball Rules Committee believe that a collegiate pitcher needs approximately .4 seconds to react and move to avoid being struck.

. . . Most baseball experts believe that a pitcher is between 51 and 52 feet away from the point of impact between the bat and ball at the time of impact, usually in an off-balance position with his glove down and back, and his weight moving forward. At 94 mph the ball will travel 52 feet in approximately .371 seconds. Game conditions using high powered aluminum bats often result in speeds well in excess of 100 mph. At 100 mph, the ball will travel 52 feet in .354 seconds; at 110 mph, a ball will travel 52 feet in .321 seconds. The NCAA Baseball Rules Committee is aware that there is some risk even with wood bats, but believes that the increased risk of injury resulting from the use of high powered aluminum bats is clear. To ignore this risk would, in our opinion, be irresponsible."

This provides independent corroboration for some of the facts relied upon by Dr. Kent and provides further facts relevant to the issue of causation.

We conclude the evidence presented by appellant is sufficient to create a triable issue of fact regarding causation. (*Saffro v. Elite Racing, Inc.* (2002) 98 Cal.App.4th 173, 180 [119 Cal.Rptr.2d 497]; *Box v. California Date Growers Assn.* (1976) 57 Cal.App.3d 266, 274 [129 Cal.Rptr. 146].)

3. *Summary Adjudication on the Claim for Punitive Damages*

H&B contends that in the event that summary judgment is reversed, this court should address its motion for summary adjudication on appellant's claim for punitive damages. Because the trial court did not reach this issue in the first instance, we believe it best that the trial court be given the opportunity to do so upon remand.

4. *NCAA Cross-appeal*

 NCAA filed a cross-appeal contending that the lower court erred in finding that NCAA did not submit admissible evidence in conjunction with its summary judgment motion. NCAA submitted 29 exhibits in conjunction with its motion, along with a declaration of Gregory Curtner, its general counsel, attesting to the authenticity of those documents.[1] Appellant never filed a written objection to these exhibits, but the trial court ruled that an attorney could not authenticate the exhibits.

Curtner's declaration stated in pertinent part: "I am admitted to practice in this action *pro hac vice*. I am familiar with the NCAA having represented it

---

[1]After the motion was argued and taken under submission, but before a ruling was issued, NCAA submitted the declaration of Ty Halpin, the custodian of records of its baseball rules committee, attesting to the authenticity of the documents previously submitted. But this was too late.

in many matters. I am also familiar with the documents, events, and issues relating to the use of non-wood bats in the game of baseball having represented the NCAA in several matters relating to bats, having deposed or interviewed most of the knowledgeable individuals on the bat issues, and having read the relevant literature on bat issues. [¶] Attached hereto are true and correct copies of the Exhibits to the NCAA's Memorandum of Points and Authorities in Support of Motion for Summary Judgment. . . . [listing titles of various documents]." The declaration did not specify that he was the custodian of these exhibits, or that these documents were prepared in the regular course of business, or that he personally prepared these documents or knew of the conditions under which they were prepared so that he could verify their trustworthiness. (Evid. Code, § 1271.)

Curtner's declaration did not provide a foundation for admissibility. It contained no evidence as to how the reports were prepared or upon what sources of information they were based, or any evidence that the reports were trustworthy. The exhibits therefore could not be admitted as business records. (*Taggart v. Super Seer Corp.* (1995) 33 Cal.App.4th 1697, 1706 [40 Cal.Rptr.2d 56].) The trial court correctly ruled that they were inadmissible.

Given that the trial court's determination in favor of the NCAA was based on its conclusion that appellant would be unable to truthfully plead causation, and we have found sufficient evidence to raise a triable issue of fact on causation, the trial court's grant of judgment on the pleadings in favor of the NCAA must also be reversed.

### DISPOSITION

The judgment is reversed and the matter is remanded to the trial court. Costs are awarded to appellant.

Epstein, Acting P. J., and Curry, J., concurred.

Respondents' petitions for review by the Supreme Court were denied March 26, 2003.