[No. A106375. First Dist., Div. Four. May 18, 2006.]

SUSAN FORD et al., Plaintiffs and Respondents, v.
POLARIS INDUSTRIES, INC., et al., Defendants and Appellants.

COUNSEL

Bowman and Brooke, George W. Soule, Janice K. O'Grady; Bingham McCutchen, David M. Heilbron and Robert A. Brundage for Defendants and Appellants.

Walkup, Melodia, Kelly, Wecht & Schoenberger, Paul V. Melodia, Michon Herrin; De Goff and Sherman, Victoria J. De Goff and Richard Sherman for Plaintiffs and Respondents.

OPINION

**REARDON, J.**—Susan Ford sustained severe orifice injuries after falling off the rear of a two-seater Polaris personal watercraft. The jet-powered nozzle propelled a high-pressure stream of water that tore apart her internal organs. Today she uses a colostomy bag, she urinates through a catheter, and her lower right torso and leg are numb from nerve damage. Susan and her husband sued the manufacturer and distributor of the watercraft on a strict products liability theory.

■ This appeal frames the question whether the doctrine of primary assumption of risk applies to the manufacturer of the personal watercraft so as to preclude the injured jet skier from raising a defective design claim. We

conclude that the trial court properly ruled that primary assumption of the risk did not bar plaintiff's suit. The appeal also addresses the propriety of instructions in a strict products liability case where the plaintiff alleges that the personal watercraft was defectively designed and caused her injury. We determine that the standard instructions on defective design were adequate.

Finally, defendant manufacturer insists that the court below erred in refusing to permit the jury to allocate fault to the watercraft operator for giving misleading instructions to the injured skier and to the owners and operator for failure to pass on safety warnings. This assertion begs the questions: Did the operator owe a duty not to deliver misleading instructions and did the owners and operator have a duty to convey the manufacturer's warnings? Finding no such duties, we reject these contentions as well and affirm the judgment.[1]

## I.  FACTS AND PROCEDURE

### A.  *The Accident, Injuries and Aftermath*

In April 2001 Steve and Laura Nakamura[2] bought two 2-seater Polaris SLH-700 personal watercraft.[3]

On September 9, 2001, the Fords and Nakamuras and various family members went to Lake Berryessa for a picnic. Laura took Susan for a ride on the watercraft. Susan was wearing a one-piece swimsuit and a life jacket. This was her first time riding a personal watercraft.

Susan held on to Laura's waist. After about five minutes, Laura stopped to tell Susan she was holding on too tight and to hold on to the grips behind her instead. Susan looked around; all she saw were the grab handles. She had to lean back and could only hook a couple fingers into each handle.

They started out again in a straight line. The jet ski was "bumping up and down." Susan lost her grip, was lifted off the seat and fell backward off the rear of the watercraft. As Susan hit the water she felt "a lot" of pain and vomited. Laura saw Susan floating in a pool of blood. Paramedics rushed Susan by helicopter to University of California Davis Medical Center.

Susan sustained a severe hernial and rectal injury. Her internal bleeding required multiple transfusions. Two surgeries were required to prepare and

---

[1] The parties to this appeal are appellants Polaris Industries, Inc., and its dealer, Dixon Polaris (hereafter Polaris), and respondents Susan and Anthony Ford.

[2] Steve is Susan's brother.

[3] A personal watercraft is a small jet-propelled vessel. The sport of riding a personal watercraft is referred to as jet skiing.

establish a colostomy. Medical records indicate she also required "massive resuscitation . . . from her initial operation."

Susan was in the hospital for 10 days, followed by a five-day postoperative stay at North Bay Medical Center.

Susan has no control over her bowels. She was evaluated for rectal-colon reconstructive surgery, but the specialist concluded there was no possibility of reconstruction. When Susan learned this, she "basically fell apart."

The injuries also created urological complications such that Susan must self-catheterize in order to urinate. As well, Susan is numb from her right kneecap to her waist; her buttocks and pelvic area are also numb. She can no longer engage in such activities as playing softball and dancing. And, because of loss of sensation and the physical limitations she endures, Susan and Anthony's sex life has suffered. Susan used to work at Raley's Superstore but was unable to keep up with her responsibilities after she returned to work. She now takes care of her father-in-law.

## B. *Cause of the Accident*

Michael Burleson, an industrial engineer and safety professional with extensive experience on personal watercraft concerns, testified that the jet nozzle is centrally positioned in back of the Polaris watercraft and protrudes two and five-eighths inches beyond the rear deck. The position of the jet increases the chance of high-pressure exposure should a passenger be ejected to the rear of the watercraft. Susan landed less than a foot from the back of the jet nozzle.

When a watercraft is accelerating and encounters a wave, the passenger can "get some lift" off the seat, and if the passenger is not well coupled to the craft he or she may lose balance and roll off. When there is a rearward ejection into the stream of water thrust by a jet nozzle such as occurred with Susan, the high pressure of the water penetrates the body, causing internal injuries.

## C. *Design Defect*

### 1. *Plaintiffs' Case*

Burleson explained that because it is important that nothing interfere with the operator's ability to control a personal watercraft, a passenger cannot always hold on to the operator. Sometimes passengers pull more than is comfortable for the operator. In some situations it may not be feasible to hold

on, for example if the operator stands up to move around. As well there may be social constraints to holding on to the operator. A significant difference in size may also militate against holding on.

In Burleson's opinion there was a defect in the design of the SLH Polaris watercraft because this particular craft lacked adequate design safeguards to protect against a rearward ejection injury. In other words, there was no easily identifiable alternative means for the passenger to hold on when it was not feasible to hold on to the operator.

Several feasible design features were available to Polaris to protect against rear ejections. A seatback is one alternative to prevent the passenger from "coming off" the back.[4]

Another solution would be recognizable and accessible handgrips that the passenger can "grasp completely." The grips Burleson proffered protruded from the side of the craft. Many manufacturers have switched from protruding handles to the recessed handles that were on the Polaris craft.[5, 6]

For 50 cents at most, a simple seat strap that goes around the seat would provide a secure handhold for passenger stability. Several models in the Polaris manual for this machine had a seat strap, and there were bolt holes for such a strap on the craft but it had not been installed. Had the machine been equipped with a seat strap, Burleson did not think the accident would have occurred.[7]

Dr. Edward Karnes was the Fords' human factors engineer. That discipline concerns the evaluation of human factors involved in the design and use of products, including how people understand risks and respond to warnings. He described the hazard in this case as falling off the rear of the watercraft and being struck by the jet thrust. The manufacturer's job is to identify and evaluate hazards and make decisions about remedies according to a safety

---

[4] No originally equipped watercraft were sold with a seatback in 2001. Polaris offered evidence that a seatback would be in the way if installed on a two-person watercraft, and would increase the risk of back injuries.

[5] Polaris's expert testified that in 2001 there were not any personal watercraft marketed with protruding side handles. The purpose of recessed handles is "to minimize inadvertent contact with the handles."

[6] Apparently the Polaris watercraft was equipped with sculpted outside handles, also referred to as detents or fingerholds, with a rear grip handle primarily used for reboarding from the water. Susan reached for this grip handle.

[7] On cross-examination, Burleson stated that although the seat strap can provide a way to hold on, it was not the best solution for rearward ejection. The strap is an active device, meaning the passenger has to use it. On the other hand a seatback, for example, would provide passive safety that would be there all the time.

hierarchy. The first tier on the hierarchy is to design out the hazard. If that cannot be accomplished, the next tier would be to provide some type of guard to prevent access to the hazardous situation. Warning—the last tier—is an appropriate remedy only if the hazard cannot be eliminated by design or guard.

Polaris's solution to orifice injuries was to admonish participants to wear protective clothing. The rear and front on-craft labels for the SLH warned that the passenger must wear a wetsuit or equivalent protective clothing to avoid orifice injuries. The owner's manual reproduced the rear decal, in bigger typeface, as well as the front warning label, and instructed elsewhere to wear protective clothing for body or orifice protection. Susan did not notice the warning decal and, being a guest, she never saw the owner's manual.

In Dr. Karnes's opinion, warnings alone were not an appropriate remedy for the hazard that creates the risk of orifice injury. He regarded the cost of compliance—or the effort required to comply with warning—as high for wearing a wetsuit. First, they are not comfortable when worn in warm weather conditions. Second, the likelihood that owner-operators would have wetsuits on hand for recreational passengers such as friends or family members is "going to be about nil." Third, the person at greatest risk—the passenger—is also the person least likely to have read the vehicle warning label.

Moreover, although the Polaris decal warning provided correct basic risk factor information about the need to wear protective clothing, the forceful entry of water into orifices and the need for all riders to wear protective clothing, Karnes considered the warning inadequate because it did not identify the risk (falling off the rear of the craft) or pinpoint those who were at greatest risk, namely passengers. Additionally, had the decal been placed on the seat, it would be more conspicuous to the passenger. From the operators' perspective, the warning label fails to tell them directly not to give a ride to someone who is not wearing protective clothing, and why this is important. Further, the admonition to wear protective clothing was under-mined by the safety video which did not discuss orifice injuries or the special risk to passengers, and indeed portrayed passengers in bathing suits, never in protective clothing.

## 2. Defendants' Case

Kevin Breen, Polaris's forensic engineer, concurred that it was likely Susan would not have been injured had she been holding on to a seat strap. The force required to dislodge a passenger holding on to a seat strap compares

favorably with the force to dislodge the operator: It is the same or a bit greater. Indeed, the Polaris manual states that the passenger should hold on to the operator or seat strap.

Breen also stated that although orifice injuries are exceedingly rare, watercraft manufacturers cannot ignore them and have a responsibility to try to design features that would prevent or minimize the risk.

Breen tested different fabrics to determine whether other materials would have prevented Susan's injuries by reducing the water pressure behind the fabric below five pounds per square inch, the threshold for sphincter muscle tension. Both the neoprene wetsuit and blue jeans sufficiently reduced the water pressure. Susan wore denim shorts to the lake, but not when she boarded the watercraft.

Polaris designated Daniel Schroepher as the employee most qualified to address safety features on the SLH such as rear passenger seating, safety testing and safety studies. He testified that Polaris designed the SLH in-house. By the time of the 1996 model year, the label warned against orifice injuries. Polaris did not conduct tests to distinguish the risk of falling off the back of the craft as opposed to the side.

Schroepher identified several design features intended to prevent the passenger from sliding off the back. The driver's seat and handgrips were of nonslippery material so the driver could stay put as well as the passenger who was hanging on. The foot pad was also of grippy material, and there was a spot where the passenger could put his or her heels. Grab handles were an option to stay on board if there was discomfort with holding on to the operator. Schroepher testified that Polaris had been aware of the possibility of falling off the watercraft and the nature of injuries that could be sustained, and had done everything it could to address the situation.

Schroepher was not sure if Polaris ever provided seat straps for the two-person SLH. They were not offered as an optional feature because there was "no safety need" and "engineering got busy and was never able to get it done."

By 2001 Polaris was aware that the thrust of the jet pump would be dangerous to someone who fell off the rear of a moving watercraft. Yet the Polaris safety video did not refer to the risk of orifice injury. Schroepher offered as a rationale for this omission that Polaris "wanted to provide adequate information but not drag out the video so it's so long so people won't watch it." Therefore, the video "hit the highlights" such as wearing proper gear, avoiding collisions and the most common injuries. "And if you do those things, then it would avoid orifice injuries . . . ."

D.  *The Nakamuras' Interaction with Polaris*

Prior to completing the purchase of the SLH-700 watercraft, Steve and Laura Nakamura watched a safety video at the dealership as required by Polaris. Neither the video nor representatives of the dealership mentioned the need to wear protective clothing or the risk of falling backward and sustaining orifice injuries. As described by Schroepher, the marketing product manager for Polaris, the safety video highlighted issues such as common injuries and how to avoid collisions.

The Polaris dealer went through the owner's manual with Steve Nakamura, pointing out all the warnings and stressing the importance of reading the manual. Polaris required Steve to sign a warranty registration certifying that he received and would read the owner's manual and warning labels before using the watercraft, and would ask anyone he allowed to use the craft to also read the labels and manual. Steve skimmed through the manual, focusing on maintenance issues. Prior to the accident he did not read the warning decals, including the decal advising **"SEVERE INJURY or DEATH . . . . [¶] WEAR PROTECTIVE CLOTHING."** Nor was it his practice to have guests read the manual and labels. The Nakamuras did not have any discussion with Susan about what to wear when riding the watercraft.

E.  *Procedural History*

In September 2002 the Fords filed suit, alleging causes of action for "products liability" against Polaris and negligence against Laura Nakamura. Polaris cross-complained against Laura for equitable indemnity.

Laura moved for summary judgment asserting that the doctrine of primary assumption of risk barred the Fords' action against her. Laura argued that she owed no duty to eliminate, or protect Susan against, "the risk of falling while the water craft was engaged in its maneuvers[,] as those maneuvers constitute a risk inherent in, if not the very purpose of, the sport itself." The Fords did not oppose the motion but Polaris did, arguing that Laura failed to communicate to Susan the instructions and warnings provided by the company, and wrongfully instructed her to ride the watercraft in an unsafe manner.

Granting the motion and directing that judgment be entered in Laura's favor, the trial court concluded that the activity that Laura and Susan were engaged in was subject to the doctrine of primary assumption of the risk: "[T]his . . . personal water craft operation was being done for enjoyment or thrill. It does require physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury. [¶] And, in addition, even though there is no competition . . . or race going on with other operators

of personal water craft, there was a kind of competition going on with the elements including waves [set up] by other boats and the testing of oneself against the challenges of speed and sudden turns."[8] As to Polaris's claims, the court ruled that although Laura did not communicate to Susan the Polaris warning to wear protective clothing, and told her to hang on to the handles, contrary to Polaris instructions and warnings, these lapses at most amounted to mere negligence. Therefore under the doctrine of primary assumption of the risk Laura owed Susan no duty of care.

Polaris also moved for summary judgment, arguing that under principles of collateral estoppel, the court must apply primary assumption of the risk to the Fords' claims against it. Denying the motion, the trial court explained that reliance on the ruling in favor of Laura was misplaced because the Fords' allegations against Polaris concerned its duty to provide products free of design defects, a duty that did not attach to Laura. Moreover, while the court acknowledged that primary assumption of the risk may be applied to the activity of jet skiing, there was no finding that " 'rearward ejection jet thrust injuries' " were inherent in the sport.

At the close of evidence Polaris moved unsuccessfully for nonsuit, arguing that plaintiffs did not prove that Polaris increased the risks inherent in jet skiing. As well, Polaris proposed a special instruction to the effect that plaintiffs must prove "[t]hat the defects increased the risk of harm beyond those risks that are a normal part of the sport of jet skiing." The court denied the instruction, ruling that if plaintiffs prove a defect, "that ipso facto raises the risk beyond those normally inherent in jet skiing and, therefore, requiring the jury to return a finding on that would not only be a redundancy but would be a confusing factor." Polaris also proposed a special verdict that asked whether the design defect increased the risk of harm. The court rejected this verdict form.

Additionally, Polaris sought to allocate fault to the Nakamuras pursuant to Civil Code section 1431.2, proposing a verdict form permitting such allocation. The court declined this request.

The jury returned a special verdict against Polaris on the design defect claim, awarded Susan $382,024 in economic losses and $3,262,500 in noneconomic losses, and awarded Anthony $115,000 for loss of consortium. The jury also found that Susan was not comparatively negligent. This appeal followed.

---

[8] The trial court's decision is in line with two recent appellate opinions determining, among other issues, that the personal use of jet skis (*Whelihan v. Espinoza* (2003) 110 Cal.App.4th 1566, 1573 [2 Cal.Rptr.3d 883]) and the Sea-Doo personal watercraft (*Peart v. Ferro* (2004) 119 Cal.App.4th 60, 74 [13 Cal.Rptr.3d 885]) were active sports to which the primary assumption of risk doctrine applied. Neither involved a claim of strict products liability.

## II. DISCUSSION

A. *Assumption of the Risk Meets Strict Products Liability on a Recreational Equipment Design Defect Claim.*

### 1. *Introduction; Standards of Review*

Although Polaris frames the primary issue on appeal in terms of the court's failure to require Susan to prove not only that there was a design defect, but that the defect increased the inherent risks of jet skiing—an error manifest in denied instructions, denied nonsuit motion and rejected verdict form—the heart of its argument is that the court erred in deciding the lawsuit did not fall within the doctrine of primary assumption of the risk. We address both concerns.

The existence and scope of a defendant's duty of care in the context of primary assumption of the risk is a legal question to be decided by the court. (*Knight v. Jewett* (1992) 3 Cal.4th 296, 313 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*); see *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1004 [4 Cal.Rptr.3d 103, 75 P.3d 30] (*Kahn*).) Therefore, we review, de novo, the trial court's decision denying Polaris's motion for summary judgment on primary assumption of the risk. (Code Civ. Proc., § 437c, subd. (p)(2); *American Golf Corp. v. Superior Court* (2000) 79 Cal.App.4th 30, 35 [93 Cal.Rptr.2d 683].) However, as we conclude that primary assumption of the risk does not bar the Fords' action, we next evaluate the nature of Polaris's duty as the manufacturer of recreational equipment, and whether the jury instructions on products liability/design defect were adequate in this context. The standard of review for a claim of instructional error of this type is also de novo because the question is one of law, involving the determination of the applicable legal principles. (*National Medical Transportation Network v. Deloitte & Touche* (1998) 62 Cal.App.4th 412, 427 [72 Cal.Rptr.2d 720].)

### 2. *Legal Framework*

■ Under the general umbrella of strict products liability, the case went to the jury on the risk-benefit test for design defect.[9] Pursuant to this test, a manufacturer is strictly liable in tort where "the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design."

---

[9] As a second strand, the Fords also pursued a defective warning theory. Since the jury found that there was a defect in the design of the watercraft that caused Susan's injuries, it did not reach the issue of the adequacy of warnings.

(*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 432 [143 Cal.Rptr. 225, 573 P.2d 443].) Relevant factors pertinent to the risk-benefit analysis include "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." (*Id.* at p. 431.)

In *Daly v. General Motors Corp.* (1978) 20 Cal.3d 725, 736 [144 Cal.Rptr. 380, 575 P.2d 1162], our Supreme Court reiterated that the purposes underlying the strict products liability doctrine are to relieve injured consumers from problems of proof inherent in pursuing negligence remedies, and to protect otherwise defenseless victims of manufacturing defects by spreading the cost of compensation throughout society. The court concluded that these purposes would not be diluted or frustrated by adoption of comparative fault principles and proceeded to extend these principles to actions founded on strict products liability. At the same time and with respect to such cases, it abolished the separate defense of assumption of the risk, to the extent it served as a form of contributory negligence. (*Id.* at p. 742.)

Years later in *Knight,* involving coparticipants in a game of touch football, our Supreme Court differentiated between cases involving primary assumption of the risk—where, in view of the nature of the activity and the parties' relationship to it, the defendant owes no legal duty to protect the plaintiff from a particular risk of harm—and those involving secondary assumption of the risk, in which the defendant owes a duty of care but the plaintiff knowingly encounters the risk. (*Knight, supra,* 3 Cal.4th at pp. 314–315.) In the former situation, the absence of a duty operates as a complete bar to recovery whereas in the latter, the trier of fact apportions liability under comparative fault principles. (*Id.* at p. 315.)

The determination whether the defendant owes a legal duty to protect the plaintiff from a particular risk of harm turns on the *nature of the activity in which the defendant is engaged and the relationship of the defendant and the plaintiff to that activity.* (*Knight, supra,* 3 Cal.4th at p. 309.) As to any given active sport, "defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, [although] defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." (*Id.* at pp. 315–316.) As explained in *Kahn, supra,* 31 Cal.4th at page 1004, this passage from *Knight* reflects a policy that in a sports setting it is not appropriate to "recognize a duty of care when to do so would require that an integral part of the sport be abandoned, or would discourage vigorous participation in sporting events." Further, because the duty question also

hinges on the role of the defendant whose conduct is at issue, duties with respect to the same risk may vary depending on whether the defendant is a coparticipant, coach, recreation provider, manufacturer, and the like. (See *ibid.*)

Shortly after *Knight*, the reviewing court in *Milwaukee Electric Tool Corp. v. Superior Court* (1993) 15 Cal.App.4th 547 [19 Cal.Rptr.2d 24] (*Milwaukee Tool*), responding to the Supreme Court's direction to vacate and reconsider its prior opinion in light of *Knight*, applied the newly announced rules to a cause of action against a tool manufacturer sounding in strict products liability. (*Id.* at p. 550.) The plaintiff in *Milwaukee Tool* was an experienced glazier who was injured while using a heavy-duty variable-speed drill. The manufacturer claimed he misused the tool.

■ The reasoning of *Milwaukee Tool* is instructive. Extensively reviewing the development of the strict products liability doctrine in California (*Milwaukee Tool, supra,* 15 Cal.App.4th at pp. 555–558), the court concluded that although the doctrine is not pled in terms of classic negligence, unquestionably a manufacturer has a duty to provide consumers with defect-free products, and that duty is inherent in a strict liability cause of action (*id.* at p. 559). Indeed, courts have viewed the doctrine of strict products liability theory—which focuses on the product itself rather than the conduct of the manufacturer—"as a 'short cut' to liability where negligence may be present but may be difficult to prove. [Citations.]" (*Id.* at pp. 556–557.) Against this background, the *Milwaukee Tool* court did not hesitate to apply the duty analysis set forth in *Knight* to the question of whether the tool company in question could assert primary assumption of the risk as a complete defense to liability. (*Ibid.*)

First, the nature of the activity asserted in the action was the manufacturer's alleged production of a defective product. There was nothing "in the nature of the manufacturing activity to indicate that a finding of no duty on the manufacturer's part should be made. To the contrary, we believe there is a sound basis in the development of strict products liability doctrine to support analysis of a products liability case, even one involving an assertion of assumption of the risk, in terms of a duty on the part of the manufacturer to produce defect-free products." (*Milwaukee Tool, supra,* 15 Cal.App.4th at p. 562.)

Second, looking at the relationship of the defendant and the plaintiff to the activity, namely the use of the tool, the court noted that the accident occurred in an employment setting. Therefore, the court examined the rationale of the

firefighter's rule[10] and the related situation where a professional, such as a veterinary assistant, accepts employment involving a known risk of danger. In both cases, primary assumption of the risk has barred recovery. Notwithstanding parallels to the case at hand, the court concluded that an injury asserted to have been caused by a dangerously defective power tool is not " 'a risk that is inherent' in a worker's job." (*Milwaukee Tool, supra,* 15 Cal.App.4th at pp. 562–563.) Moreover, "[i]n the relationship of the defendant and the plaintiff to the activity, the use of the tool, it cannot be said that the plaintiff user undertook to act as a product tester or guinea pig." (*Id.* at p. 563.) In other words, the user of the tool which causes the injury is "not necessarily a professional employed to confront the very danger posed by the injury-causing agent." (*Ibid.*) Summing it up, the court stated: "[W]e believe that the purposes of strict products liability doctrine will be well served by a finding that a manufacturer owes a duty to a user of its product, thus making the primary assumption of the risk doctrine inapplicable, absent some extraordinary circumstance not reflected by this record." (*Id.* at p. 565.)

More recently, the reviewing court in *Bunch v. Hoffinger Industries, Inc.* (2004) 123 Cal.App.4th 1278 [20 Cal.Rptr.3d 780] (*Bunch*) applied *Milwaukee Tool* in the context of a sports injury. There, a girl suffered catastrophic injuries when she dove into a shallow pool. She recovered against the manufacturer of the replacement pool liner on a product liability/failure to warn theory. (*Id.* at pp. 1281–1282, 1289–1290.) The reviewing court recognized that under *Knight* and the rule of primary assumption of the risk, a participant in a sporting activity generally may not recover damages for injuries resulting from risks inherent in the sport. (*Id.* at p. 1300.) However, the test for liability for equipment providers is different from that of a coparticipant in a sport, and hence the doctrine of primary assumption of risk "does not insulate equipment suppliers from liability for injury from providing defective equipment." (*Ibid.*) Moreover, "under products liability, the manufacturer does owe a duty to produce defect-free products. [Citation.] In addition, in using a defective product, the user does not intend to confront a risk that is inherent in its use. [Citation.]" (*Id.* at p. 1301.)

---

[10] The *Knight* court explained that this rule "involves the question whether a person who negligently has started a fire is liable for an injury sustained by a firefighter who is summoned to fight the fire; the rule provides that the person who started the fire is not liable under such circumstances. [Citation.] . . . [T]he most persuasive explanation [to support this conclusion] is that the party who negligently started the fire had no legal duty to protect the firefighter from the very danger that the firefighter is employed to confront." (*Knight, supra,* 3 Cal.4th at pp. 309–310, fn. 5.)

### 3. The Trial Court Correctly Ruled That Primary Assumption of the Risk Did Not Foreclose the Fords' Strict Products Liability Claim.

Polaris's refrain on appeal, expressed in various ways throughout the briefs, is as follows: Falling off a watercraft and coming into contact with the surface of water are inherent risks of the sport of jet skiing. As well, suffering orifice injuries is an inherent, but rare, risk of the sport. Polaris owed Susan no duty to eliminate or protect against these risks and therefore primary assumption of the risk absolves it of any liability. Finally, *Milwaukee Tool* and *Bunch* "were wrongly decided" because products liability claims are not exempt from application of primary assumption of the risk principles.

#### a. *Polaris's Criticism of* Milwaukee Tool *and* Bunch

■ *Milwaukee Tool* and *Bunch* stand for the proposition that a manufacturer's duty to produce defect-free products is not obliterated by primary assumption of the risk, absent extraordinary circumstances. Polaris criticizes these decisions, asserting that they conflict with *Lipson v. Superior Court* (1982) 31 Cal.3d 362 [182 Cal.Rptr. 629, 644 P.2d 822], *Kelhi v. Fitzpatrick* (1994) 25 Cal.App.4th 1149 [31 Cal.Rptr.2d 182], and *Sanchez v. Hillerich & Bradsby Co.* (2002) 104 Cal.App.4th 703 [128 Cal.Rptr.2d 529]. Polaris's authority does not undermine *Milwaukee Tool* and *Bunch*.

*Lipson* was a pre-*Knight* case entailing application of the firefighter's rule to a claim of strict liability for an ultrahazardous activity. The court focused on the petitioners' conduct, and did not engage in the analysis of duty set forth in *Knight. (Lipson v. Superior Court, supra*, 31 Cal.3d at pp. 375–376.) *Kelhi* also involved the firefighter's rule. There, a highway patrol officer was injured by runaway tires while on duty and responding to the emergency created when the tires broke off a truck. Assuming that the manufacturer owed the general public a duty of care to manufacture a defect-free truck, the court explained that when the firefighter's rule applies as a matter of law, the case necessarily falls under the category of primary assumption of the risk in which the defendant owes no duty to the plaintiff. (*Kelhi v. Fitzpatrick, supra*, 25 Cal.App.4th at p. 1161.) The present case does not involve the firefighter's rule and therefore the primary assumption of risk doctrine is not invoked automatically. Moreover, as emphasized in *Neighbarger v. Irwin Industries, Inc.* (1994) 8 Cal.4th 532, 546 [34 Cal.Rptr.2d 630, 882 P.2d 347], "[t]he most substantial justifications for the firefighter's rule are those based on the public nature of the service provided by firefighters and the relationship between the public and the public firefighter." Those concerns are not present here.

Nor does *Sanchez* aid Polaris. In *Sanchez* the injured college pitcher pursued negligence and products liability claims against a bat manufacturer.

He alleged that the newly designed bat, made of hollow aluminum alloy with a pressurized air bladder, significantly increased the inherent risk that a pitcher would be hit by a line drive. (*Sanchez v. Hillerich & Bradsby Co., supra*, 104 Cal.App.4th at p. 707.) The reviewing court *rejected* primary assumption of the risk as shielding the manufacturer and *reversed* summary judgment because the plaintiff's evidence raised a triable issue whether the design increased the inherent risk. (*Id.* at p. 715.) As the court further explained: "If it is ultimately determined primary assumption of the risk does not apply here, the issue then becomes one of secondary assumption of the risk." (*Ibid.*) Moreover, as pointed out in *Bunch, supra*, 123 Cal.App.4th at pages 1301–1302, the court in *Sanchez* "did not discuss the interplay between products liability and primary assumption of risk. Nor did the court discuss or distinguish *Milwaukee* [*Tool*]." (*Id.* at p. 1302.)

■ While we do not agree with Polaris that *Milwaukee Tool* and *Bunch* were "wrongly decided" and in conflict with the above opinions, we are mindful that these decisions are not exact templates for the instant case: *Milwaukee Tool* was not a sports case and thus there was no need for the court to address the issue of inherent risks in assessing the scope and existence of the defendant's duty. *Bunch* was a sports case, but the issue was inadequate warnings, not design defect. There was no charge in *Bunch* that imposing on the manufacturer a duty to provide effective and adequate warnings *would change* the nature of the sport or chill participation in it. The premise of these decisions is sound: Manufacturers have an independent duty to make nondefective products that as a general rule will withstand application of primary assumption of risk principles. However, in a recreational equipment defect case such as this, the *scope* of that duty may be at issue as when, for example, the defendant asserts that the purported defect is the very failure of the product to eliminate or provide protection against an inherent risk of the sport. Under such circumstances, the court must also assess the risks inherent in the sport as part and parcel of ascertaining the *scope* of the manufacturer's duty.

### b. Analysis of Inherent Risks

To reiterate, in the context of an active sport, the "existence and scope of a defendant's duty of care . . . depends on *the nature of the sport or activity* in question and on the parties' general relationship to the activity . . . ." (*Knight, supra*, 3 Cal.4th at p. 313, italics added.) Defining the risks inherent in a particular sport thus is integral to determining whether a particular defendant owes a duty of care. (*Staten v. Superior Court* (1996) 45 Cal.App.4th 1628, 1633, 1635 [53 Cal.Rptr.2d 657].) "Inherent" means "involved in the constitution or essential character of something: belonging by nature or habit: intrinsic." (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 600.) The

court in *Freeman v. Hale* (1994) 30 Cal.App.4th 1388, 1394–1395 [36 Cal.Rptr.2d 418] articulated the test this way: An inherent risk is one that, if eliminated, would fundamentally alter the nature of the sport or deter vigorous participation. (See also *Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1261 [102 Cal.Rptr.2d 813].)

Here, the general risk of falling and coming into contact with water is inherent in jet skiing. However, Polaris asks us to evaluate its potential for liability under a rubric that includes the specific risk of suffering orifice injuries within the inherent risks of jet skiing, thereby eliminating its duty of care. The trial court specifically declined to find that such injuries are inherent in the sport. We agree.

Orifice injuries and the conduct that causes them do not belong to the "fundamental nature or habit" of the sport. Such injuries occur by way of rearward ejection into a very dangerous, defined space, namely the high-pressure stream of water thrust by the jet nozzle of the watercraft. Polaris's role with respect to the sport of jet skiing is as the manufacturer and designer of the Polaris SLH-700 personal watercraft. The Fords asserted that the watercraft was defective because Polaris did not consider or utilize appropriate alternative designs that would reduce the chances of rearward ejection into the jet propulsion. *The norm in jet skiing is to hold on.* Providing an alternative to hanging on while jet skiing in circumstances where holding on to the operator is not feasible would not alter the fundamental nature of the sport or deter vigorous participation. The Fords submitted Burleson's declaration on summary judgment to the effect that the watercraft was defectively designed and substantially increased the risk of harm because "Polaris continue[d] to manufacture personal watercraft without passenger protection against rearward ejection injuries incorporated into the design of the machines."[11] Under these facts the trial court properly denied Polaris's motion for summary judgment on primary assumption of the risk.

Citing *American Golf Corp. v. Superior Court, supra,* 79 Cal.App.4th at page 37, Polaris also maintains that what is standard in the industry defines the nature of the sport and its inherent risks. Since the designs of other

---

[11] Specifically, Burleson referred to the alternative of a passenger seatback. At trial, three possible alternative designs were advanced. Polaris found fault with all three of them, but it is not the plaintiff's burden in a design defect case to prove the existence of a feasible alternative design. (*Bernal v. Richard Wolf Medical Instruments Corp.* (1990) 221 Cal.App.3d 1326, 1335 [272 Cal.Rptr. 41], overruled on another point in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 [34 Cal.Rptr.2d 607, 882 P.2d 298].) Nonetheless, seat straps, while perhaps not the best solution to rearward ejection into the high-pressure jet stream, are feasible and inexpensive, and do not alter the fundamental nature of the sport or deter active participation. Had Susan been able to grasp one, the evidence supports a finding that she would not have been injured.

watercraft are essentially the same as the Polaris craft, the standard is established and cannot be attacked without running afoul of the doctrine of primary assumption of the risk. This argument is not sustainable in the context of a strict products liability/design defect case. None of the cases cited by Polaris stand for the proposition that primary assumption of the risk will preclude a strict products liability/design defect claim against a recreational equipment manufacturer simply because its equipment is "essentially the same" in design as that of other manufacturers.[12] To reiterate, a risk is inherent if its absence would significantly change the sport or deter enthusiastic participation. Not all design features that are "essentially the same" throughout an industry would meet this definition. Moreover, the evidence does not support Polaris's proposition: Its own expert testified that "roughly half" of watercraft sold have seat straps, and roughly half do not!

### c.  Analysis of Defendant's Role

Polaris ignores a key principle of *Knight* and *Kahn*, namely that the examination of duty under a primary assumption of risk inquiry also takes into account the defendant's role in, or relationship to, the sport in question. (*Knight, supra,* 3 Cal.4th at pp. 317–318; see *Kahn, supra,* 31 Cal.4th at p. 1004.) The same risk may pose different duties according to the function of a particular defendant with respect to a particular sport. Thus, while a batter owes no duty to avoid carelessly throwing the bat after making a hit, a stadium owner has a duty to provide a reasonably safe stadium and may be held responsible "for its failure to provide the patron 'protection from flying bats, at least in the area where the greatest danger exists and where such an occurrence is reasonably to be expected.' " (*Knight, supra,* 3 Cal.4th at p. 317, quoting *Ratcliff v. San Diego Baseball Club* (1938) 27 Cal.App.2d 733, 736 [81 P.2d 625] [spectator hit by accidentally thrown bat while walking in stands between home plate and first base].) The *Knight* court *approved* of

---

[12] See *American Golf Corp. v. Superior Court, supra,* 79 Cal.App.4th at pages 38–39 (primary assumption of risk foreclosed action against golf course for *negligent* design and placement of yardage markers: Errant shots are inherent risk of sport, yardage markers are integral to sport, and golf course as recreational provider did not increase risk of injury by its design and placement of yardage markers according to system standard); *Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 256–257 [38 Cal.Rptr.2d 65] (plaintiff's *negligence* claim against commercial rafting trip sponsors and operators barred by primary assumption of risk: Defendants owed duty to provide customers with properly equipped raft made of materials adequate for intended purpose; rafts configured with exposed metal frames were standard in industry and defined sport such that significant change in watercraft to enhance safety would necessarily reduce challenge of whitewater rafting); *Balthazor v. Little League Baseball, Inc.* (1998) 62 Cal.App.4th 47, 52 [72 Cal.Rptr.2d 337] (claim that league breached its duty not to increase risks inherent in baseball by failing to provide helmet with faceguard did not survive primary assumption of risk: Faceguard was not part of league's normal safety equipment and failure to require it did not increase risk of being struck by carelessly thrown ball).

*Ratcliff* and other cases which, in the process of analyzing the duty of proprietors of sports facilities, defined "the risks inherent in the sport not only by virtue of the nature of the sport itself, *but also by reference to the steps the sponsoring business entity reasonably should be obligated to take in order to minimize the risks without altering the nature of the sport.*" (*Knight, supra,* at p. 317, italics added.)

A number of courts have taken their cue from this language in defining the duty of the owner or operator of a sporting venue. (See, for example, *Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127, 134–135 [40 Cal.Rptr.2d 249] [duty of golf course owner/operator to provide reasonably safe golf course requires owner to minimize risks without changing nature of game; owner thus has obligation to design course to minimize risk that players will be hit with golf balls and summary judgment was improper because golfer presented evidence that location where he was hit was particularly dangerous]; *Branco v. Kearny Moto Park, Inc.* (1995) 37 Cal.App.4th 184, 190, 193 [43 Cal.Rptr.2d 392] [operator of motocross bicycle course has duty to refrain from using jumps which by design create extreme risk of injury]; *Vine v. Bear Valley Ski Co.* (2004) 118 Cal.App.4th 577, 597–598 [13 Cal.Rptr.3d 370] [above passage from *Knight* articulated appropriate standard of care by which liability of ski resort charged with designing and constructing defective snowboard jump should be determined; jury should have been instructed to consider what steps resort reasonably should have taken to minimize risk that someone would be injured on jump, without altering nature of sport].)

While the above passage from *Knight* at first glance may seem at odds with the assertion that defendants have no duty to *protect against* inherent risks, it accurately acknowledges and articulates the appropriate standard for assessing liability of proprietors and operators of sports venues whose relationship to the sport is not that of coparticipant, trainer or coach. Indeed, it is the very existence of the independent duties of such entities with respect to the design and operation of sports venues that, if renounced, *would increase* the risks inherent in a particular sport. In other words, the scope of an inherent risk of a given sport does not incorporate the additional level of risk that would be accounted for within the duty of care of proprietors and operators of sports venues to take reasonable steps to minimize those risks without changing the nature of the sport. Thus, whether the standard is stated in terms of a duty not to increase the inherent risks, or in terms of taking reasonable steps to minimize risks while not altering the sport, the import is the same. And, it goes without saying that application of such a standard propels a case out of the purview of primary assumption of the risk.

■ We see no reason why the logic of the above cited cases would not apply equally to the role of manufacturing, supplying or distributing defective

recreational equipment. Thus, by analogy to the duty of sports venue proprietors and operators, in a case such as this where the asserted design defect is the failure to incorporate protection against a serious injury into the design of the recreational equipment, the manufacturer's duty to design nondefective products could be rephrased as a duty to take reasonable steps to minimize inherent risks without altering the nature of the sport, at least under circumstances where the risk poses the gravest danger.

### 4. *The Trial Court Did Not Err in Refusing to Deliver Polaris's Special Instructions or Granting Nonsuit in its Favor.*

The question remains whether, once the trial court determined that primary assumption of the risk did not operate as a complete bar to the Fords' recovery, the court erred in refusing to instruct that in addition to proving a defective design that harmed her, Susan had to prove that the defect increased the risk of harm beyond those risks that are a normal part of the sport. Polaris's assertion of instructional error is based on the following rationale: Defendants generally have a duty to use due care not to *increase* the risks to a participant over and above those inherent in the sport. Therefore liability cannot attach to Polaris absent a finding, supported by substantial evidence, that the manufacturer's design of the watercraft increased the risk of harm. Plaintiffs offered no substantial evidence on this factor and, equally fatal, the jury was not instructed accordingly. Thus the judgment must be reversed and a new trial set.

Here, the trial court determined that a finding of a design defect would in itself establish that Polaris increased the risk of harm inherent in jet skiing, and therefore instructions also requiring plaintiffs to prove that the defect increased those risks would be redundant and confusing. We agree. The inherent risk is falling into the water. The Fords' theory was that the Polaris SLH-700 watercraft was defectively designed because it did not provide a way for the passenger to hang on securely when it was not feasible to hold on to the operator. We have concluded that the asserted design defect did not attack an inherent risk of the sport because protecting against rearward ejection into the jet stream, thereby preventing orifice injury, would not alter the sport or deter vigorous participation. The very nature of the defect necessarily increased the likelihood that a passenger would fall rearward and suffer the extreme harm of orifice injuries. Thus as a matter of law the defect escalated the risk of harm beyond the inherent risk of falling into the water.

*Ferrari v. Grand Canyon Dories, supra,* 32 Cal.App.4th at page 255 is instructive. The plaintiff suffered injuries when her head struck the metal frame of a raft. The reviewing court applied primary assumption of the risk to bar the plaintiff's claim that the defendants owed a duty to provide rafts not

configured with exposed metal frames, reasoning that metal frames were standard in the industry and a significant change in the watercraft to enhance safety would reduce the challenge of the sport. (*Id.* at p. 257.) Nevertheless the court also observed that, given the inherent risks in whitewater rafting "it is readily apparent that providing a raft not equipped with grips or other mechanisms to help the passengers avoid ejection . . . would unreasonably increase the risk of injury." (*Id.* at p. 255, fn. omitted; see also *Branco v. Kearny Moto Park, Inc., supra,* 37 Cal.App.4th at p. 193 [jumps and falls are inherent to sport of motocross racing and although under doctrine of primary assumption of risk the race course operator has no duty to eliminate jumps or protect against injury arising from reasonably designed jumps, it does have duty not to design jumps that create extreme risk of injury].) Here, too, the absence of an alternative mechanism to help avoid rearward ejection increased the risk of serious injury. And again, while Susan did not have to prove a feasible alternative design, the seat strap was cheap, feasible and provided an alternative to holding on to the operator without any meaningful alteration of the watercraft.

To recap: With the jury's findings that the watercraft was defectively designed and that the defect caused Susan's injury, there was no need for Polaris's special instruction. The standard instructions on strict products liability/defective design were adequate, informing the jury that in deciding "whether or not a product possessed a defect in its design, if plaintiff proves that the design of the product was a cause of injury to plaintiff, Polaris then must prove that the benefits of the design outweigh the danger inherent in that design. [¶] In determining whether the benefits of the design outweigh its risks you may consider, among other things, the gravity of the danger posed by the design, the likelihood that the danger would cause damage, the mechanical feasibility of a safer alternate design at the time of manufacture, the financial cost of an improved design, and the adverse consequences to the product and the consumer that would result from an alternate design."

These criteria, stated in black-letter strict products liability terms, essentially encompass the criteria that would be assessed in determining whether a defendant breached the duty not to increase the inherent risks of a sport; or, stated in the more particular terms of the standard of care announced in *Knight* and its progeny for proprietors of sports venues, whether defendant breached the duty to pursue reasonable steps to minimize inherent risks without altering the nature of the sport. Determination of whether a particular design increased the inherent risks—or of what steps a manufacturer reasonably should take to minimize risks without altering the sport—would necessarily focus on the ingredients of a risk/benefit analysis, namely the feasibility and cost of an alternative design, the gravity and likelihood of the danger to be avoided by such alternative, and the consequences flowing from it. On this

latter point, adverse consequences to the product and consumer would include changes that alter the nature of the sport or activity.

B. *The Trial Court Did Not Err in Precluding Allocation of Fault to Laura as Operator/Coparticipant and to the Nakamuras as Suppliers of the Watercraft.*

Polaris faults the trial court for rejecting a verdict form that would have permitted the jury to allocate some fault to Laura as operator/coparticipant and to the Nakamuras as the owners and suppliers of the personal watercraft. There was no basis to assign liability to them and therefore the trial court properly declined this request.

1. *Polaris Cannot Allocate Fault to Laura as Operator/Coparticipant.*

Notwithstanding that the trial court absolved Laura of liability under the doctrine of primary assumption of the risk, Polaris insists that the jury should have been allowed to assign fault to her as operator of the watercraft. Specifically, Polaris argues the jury could have apportioned some fault to her upon finding she negligently failed to relay the manufacturer's warnings to Susan and provided misleading instructions. Laura was not a tortfeasor and hence no fault could be allocated to her.

a. *Comparative Fault Principles*

Civil Code section 1431.2, subdivision (a) provides: "In any action for personal injury . . . based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." Our Supreme Court has explained that this statute "neither states nor implies an exception for damages attributable to the fault of persons who are immune from liability or have no mutual joint obligation to pay missing shares. On the contrary, [the statute] expressly affords relief to every tortfeasor who *is* a liable 'defendant[]' . . . ." (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140] (*DaFonte*).) In *DaFonte*, a plaintiff ranch employee was injured by a harvester while on the job. The question was whether the manufacturer could limit its liability for noneconomic damages by the amount attributable to the employer's fault, notwithstanding that the employer was immune from tort damages for job-related injuries under our workers' compensation laws. (*Id.* at pp. 596–597.) Rejecting the proposition that Civil Code section 1431.2 does not permit appointment of fault to absent or immune tortfeasors, the court

held that "the only reasonable construction of section 1431.2 is that a 'defendant['s]' liability for noneconomic damages cannot exceed his or her proportionate share of fault *as compared with all fault responsible for the plaintiff's injuries,* not merely that of 'defendant[s]' present in the lawsuit." (*DaFonte, supra,* at p. 603; *Taylor v. John Crane, Inc.* (2003) 113 Cal.App.4th 1063, 1069 [6 Cal.Rptr.3d 695].)

*DaFonte* did not dictate the same result when the defendant asbestos manufacturer attempted to allocate fault to tobacco companies that were themselves protected from direct liability for providing an inherently unsafe product. Civil Code section 1714.45, as enacted at the time,[13] amounted to a legislative judgment that such companies had no legal fault or responsibility for harm caused by their products. (*Richards v. Owens-Illinois, Inc.* (1997) 14 Cal.4th 985, 988–989 [60 Cal.Rptr.2d 103, 928 P.2d 1181] (*Richards*).)[14] The court in *Richards* concluded that under the conditions described in the statute, a tobacco supplier breaches no duty and commits no tort against knowing and voluntary smokers by making cigarettes available to them. (*Id.* at pp. 1000–1001.) On the other hand, as emphasized in *DaFonte,* an employer's immunity from tort damages for work-related injuries under the workers' compensation scheme does not imply an absence of legal fault in an employer whose act or omission contributed to the employee's injury. (*Id.* at p. 998.)

b. *Analysis*

*Richards,* not *DaFonte,* controls. Laura prevailed on summary judgment based on primary assumption of the risk. The judgment in her favor was a judgment that as a matter of law, Laura, as operator/coparticipant, owed no duty of care to Susan. Because Laura breached no duty and committed no tort, there is no legal fault to apportion to her.

■ Nonetheless, Polaris urges that the nature of the assumption of risk doctrine triggers a different rule. Specifically, Polaris posits that the negligence of Laura as a coparticipant is an inherent risk that Susan assumed and damages attributable to that negligence should rest with her, not the manufacturer. Polaris's proposal would eviscerate a central principle of *Knight* and *Kahn,* namely that in the context of an active sport, the question whether

---

[13] The 1997 amendment to Civil Code section 1714.45, subdivision (a)(2) eliminated the reference to tobacco. (Stats. 1997, ch. 570, § 1.)

[14] *Richards* was an action by a smoker for asbestos-related lung injury. The defendant asbestos manufacturer attempted to establish that cigarette manufacturers also shared fault for these injuries because they supplied the harmful tobacco products the plaintiff consumed, and thus the defendant's liability for the plaintiff's noneconomic damages should have been reduced accordingly. (*Richards, supra,* 14 Cal.4th at pp. 989–991.)

defendant has a legal duty to protect plaintiff from a particular risk of harm *does not depend* on the reasonableness or unreasonableness of plaintiff's conduct in subjecting him or herself to the risks of the game, including the risk of a coparticipant's conduct. Rather, the question of duty hinges on the nature of the sport and the relationship of plaintiff and defendant to that sport. (*Knight, supra,* 3 Cal.4th at pp. 309, 315; see *Kahn, supra,* 31 Cal.4th at p. 1004.)

Our reasoning does not run counter to Civil Code section 1431.2. Polaris has elected to engage in the industry of manufacturing recreational equipment for use in active sports. Because some risk of injury is inherent in active sports, our Supreme Court has recognized that it is inappropriate to hold coparticipants in sports activities liable for ordinary careless behavior. To do so would tend to deter vigorous participation in the sport or alter its fundamental character. (*Knight, supra,* 3 Cal.4th at pp. 315–316, 318–320; see *Kahn, supra,* 31 Cal.4th at pp. 995–996, 1004.) Thus liability will attach to a sports participant "only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Knight, supra,* 3 Cal.4th at p. 320, fn. omitted.) The same general standard applies to sports instructors or coaches. (*Kahn, supra,* 31 Cal.4th at pp. 996, 1011.) In the arena that Polaris operates, the standard of care imposed on coparticipants, coaches and instructors is lower than the standard for ordinary negligence. There is a sound basis for this distinction. It would be anomalous if Laura could be assigned "fault" for her actions as a jet skiing coparticipant/watercraft operator in Susan's suit against Polaris, while as a matter of sound public policy she nevertheless has no direct liability to Susan for those actions. (See *Richards, supra,* 14 Cal.4th at pp. 1000–1001.)

### 2. The Nakamuras Had No Duty to Call Susan's Attention to the Manufacturer's Warnings.

As owners of the watercraft supplied for the family jet skiing activities on the day of the accident, the Nakamuras had a duty not to supply faulty equipment. (*Bjork v. Mason* (2000) 77 Cal.App.4th 544, 553–554 [92 Cal.Rptr.2d 49].) However, the Nakamuras played no role in the watercraft's defective condition and thus *Bjork* does not apply. They also had a duty to warn of the watercraft's defective condition if they had, or reasonably should have had, such knowledge. (*Yamaha Motor Corp. v. Paseman* (1990) 219 Cal.App.3d 958, 968 [268 Cal.Rptr. 514].) Again, they had no knowledge of the defective condition.

Nevertheless, Polaris asserts Steve Nakamura also had a duty to call to Susan's attention the warnings on the craft and in the owner's manual. Polaris

maintains that a jury could find that Steve was on notice of the " 'SEVERE INJURY OR DEATH/WEAR PROTECTIVE CLOTHING' " warning, and knowing this was Susan's first time on the watercraft should reasonably have called her attention to it. The trial court determined that the law did not impose on the owner "a manufacturer's duty to warn."

Polaris first relies on the fact that Steve Nakamura signed a warranty registration form agreeing to ask anyone who used the watercraft to read the manual and labels. However, Polaris does not explain how any representation made in the warranty registration form could create a duty to third parties.

Polaris also cites section 388 of the Restatement Second of Torts (Restatement), which provides that a person who supplies "a chattel for another to use is subject to liability . . . for physical harm caused by the use of the chattel in the manner for which . . . it is supplied, if the supplier [¶] (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and [¶] (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and [¶] (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

Comment k to Restatement section 388 indicates that the supplier's duty to warn is limited, as follows: "One who supplies a chattel to others to use for any purpose is under a duty to exercise reasonable care to inform them of its dangerous character in so far as it is known to him, or of facts which to his knowledge make it likely to be dangerous, if, but only if, he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved. It is not necessary for the supplier to inform those for whose use the chattel is supplied of a condition which a mere casual looking over will disclose, unless the circumstances under which the chattel is supplied are such as to make it likely that even so casual an inspection will not be made."

Here, the warning about the potential for orifice injuries and the need to wear protective clothing appeared on the body of the watercraft and in the owner's manual. There were two warning labels on the craft itself. One was located on the rear of the craft above the boarding platform where riders could board, and one was located in the front under the handlebars. The Nakamuras had not removed or altered the on-craft decals. Although Susan stepped onto the craft from the side and did not board from the rear, there were no special conditions that would have deterred her from casually taking notice of the labels as she approached and looked around the craft.

Oftentimes, as was the case here, those who supply the watercraft are also participating in the sport. The Nakamuras did not lend the watercraft to someone else to use and operate. In such a situation they might have been inclined to call the borrower's attention to the owner's manual. Instead, Laura and Susan went out on the craft together to have a good time. Polaris is attempting to foist on to suppliers/coparticipants the extra job of being the company's representative with the responsibility of nudging every passenger to read the label and owner's manual. This is unrealistic given the nature of the activity and the role of suppliers/coparticipants in that activity. As between the supplier/coparticipant and the manufacturer of the watercraft, the Nakamuras should be able to rely on the manufacturer's placement, design and content of warning labels to communicate its safety concerns to passengers. By not altering or removing the label, and in the absence of any special conditions, including any mental or physical limitations presented by the passenger, the supplier/coparticipant has no further duty with respect to the manufacturer warnings.

## III.  DISPOSITION

The judgment is affirmed.

Ruvolo, P. J., and Sepulveda, J., concurred.